998 A.2d 606

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Robert Anthony FLOR, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 2008.

Decided July 22, 2010.

Ann P. Russavage–Faust, Bucks County Defender's Office, Christa Schott, Doylestown, for Robert Anthony Flor.

Michelle Ann Henry, Bucks County District Attorney's Office, Amy Zapp, Harrisburg, Holly Elizabeth Smith, Stephen B. Harris, Warrington, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice McCAFFERY.

Robert Anthony Flor ("Appellant") challenges on direct appeal his judgment of sentence of death for the first-degree murder of a police officer in a hospital emergency room. Appellant also challenges the legality of his sentence for ten counts of recklessly endangering another person, which arose from the same criminal episode. We affirm Appellant's judgment of sentence of death, but vacate his sentence for the counts of recklessly endangering another person, and remand for resentencing on those counts.

The relevant facts of this case are as follows. On September 29, 2005, Appellant and his then-girlfriend, Patricia Kairis, had an argument at his grandmother's home, to which police responded following a 911 call. Both Appellant and Ms. Kairis had been drinking alcohol, and their argument stemmed at least partially from their recent loss of custody of their young daughter. Prior to the arrival of police, Appellant got into his vehicle and drove away with Ms. Kairis in the passenger seat. As Appellant was driving, he repeatedly struck Ms. Kairis, who unsuccessfully attempted to escape from the vehicle.

Joseph Carcaci, an off-duty state trooper, stopped Appellant's car after he observed Appellant driving erratically, recklessly, and at high speed while repeatedly assaulting his female passenger. Officer Brian Gregg, of the Newtown Borough Police Department, arrived on the scene to assist Trooper Carcaci shortly after the vehicle stop. The officers arrested Appellant, handcuffed him, placed him in the back of a patrol car, and drove him to the police station. By this time, Officer James Joseph Warunek, also of the Newtown Borough

Police Department, had arrived at the station to assist Officer Gregg.

Detecting an odor of alcohol on Appellant's breath and believing that Appellant had been driving under the influence of alcohol, Officers Gregg and Warunek transported Appellant to St. Mary Medical Center in Langhorne for collection of blood and urine samples for testing. Appellant was calm and cooperative, conversing with the officers and with the emergency room personnel. Officer Warunek then accompanied Appellant to a lavatory in the emergency room in order to obtain his urine sample. After Appellant gave Officer Warunek the urine sample, the officer started to re-handcuff Appellant, at which time Appellant suddenly grabbed the officer's gun out of its holster and immediately shot Officer Warunek in the chest at close range. When Officer Gregg ran to assist, Appellant shot him in the abdomen. Appellant also shot Joseph Epp, an emergency medical technician on duty at the medical center. At some point during this initial gunfire, one of the bullets also struck Appellant's own hand. Appellant then walked to the spot where Officer Gregg was lying wounded on the floor, and fired the gun twice at close range into the officer's head. Finally, Appellant returned to Officer Warunek, who was also lying on the floor, pointed the gun at the officer and pulled the trigger; however, by this time there were no more bullets in the gun.

Appellant ran from the scene, leaving a trail of blood, but shortly thereafter police found him lying in a vehicle parked in the hospital garage. They re-apprehended him and returned him to the emergency room for treatment of his hand injury. During his re-apprehension and medical treatment, Appellant acted in a threatening, hostile, and verbally abusive manner toward hospital and law enforcement personnel, and he stated that he shot the officers, who, he said, "got what they fucking deserved." Notes of Testimony ("N.T."),[1] 11/9/06, at 182, 189.

Officer Gregg died almost immediately from massive brain injury caused by the gunshots to his head. Officer Warunek

---

1. Unless otherwise indicated, "N.T." refers to the notes of testimony from the penalty phase proceedings.

remained in the hospital for two days and subsequently underwent surgery to remove the bullet from his chest. Mr. Epp was unconscious for approximately two days, spent a total of six days in the hospital, experienced excruciating pain, and underwent five surgeries to repair extensive damage to his shoulder and collarbone.

The Commonwealth filed a criminal complaint and then an amended complaint, charging Appellant with murder in the first-degree as well as numerous other offenses, including two counts of attempted murder, multiple counts of aggravated assault and robbery, two counts of terroristic threats, ten counts of recklessly endangering another person, escape, former convict not to possess a firearm, simple assault, unlawful restraint, driving under the influence of alcohol, resisting arrest, and disarming a law enforcement officer. On December 1, 2005, the Commonwealth filed notice of intent to seek the death penalty, and the following day, Appellant entered a plea of not guilty to all charges.

On September 15, 2006, Appellant filed a petition for evaluation of competency, alleging that he was suffering from a mental illness that rendered him unable to assist in his own defense. After a competency hearing on October 13, 2006, at which three expert witnesses testified for the defense and one expert witness testified for the Commonwealth, the court found Appellant competent to stand trial, outlining in detail its reasons for the decision. N.T. Competency Hearing, 10/13/06, at 147–55.

On October 23, 2006, Appellant withdrew his previously entered pleas of not guilty to all the charges and entered pleas of guilty to first-degree murder and of *nolo contendre* to thirty other counts. The court then conducted a lengthy penalty phase hearing before a jury on the murder conviction, following which, on November 17, 2006, the jury found four aggravating circumstances and no mitigating circumstances and accordingly returned a sentence of death. *See* 42 Pa.C.S. § 9711(c)(1)(iv). The aggravating circumstances that the jury found applicable were the following: the victim was a peace

officer; the defendant committed the murder during the perpetration of a felony; while committing the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim; and the defendant had a significant history of violent felony convictions.[2] The court imposed the death sentence, as well as a consecutive aggregate term of imprisonment of not less than sixty-five years nor more than one hundred and thirty years for the non-capital offenses. Appellant filed post-sentence motions, which were denied by the trial court on December 1, 2006. Appellant then filed the instant direct appeal to this Court, raising eleven issues for our review.[3]

## Sufficiency Review

■ Pursuant to 42 Pa.C.S. § 9711(h)(1), a sentence of death is subject to automatic review by this Court. We must

2. Respectively, 42 Pa.C.S. § 9711(d)(1), (6), (7), and (9).

3. Appellant's issues, reordered and numbered for ease of disposition but otherwise set forth verbatim, are as follows:

■ Did the trial court err in holding that Appellant was competent to stand trial?

■ Did the trial court err in denying counsels' request for a trial continuance?

■ Did the trial court err in denying counsels' motion *in limine* to limit evidence regarding Appellant's prior felony convictions?

■ Are Title 42 Pa.C.S.A. § 9711(d)(1), (d)(6), (d)(7), and (d)(9) unconstitutionally vague and overbroad and/or unconstitutional as applied?

■ Was the verdict supported by sufficient evidence in that the Commonwealth failed to establish beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances?

■ Was the verdict of no mitigating circumstances against the weight of the evidence?

■ Did the jury's verdict of death following a finding of no mitigation violate the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 6, 9, and 13 of the Pennsylvania Constitution?

■ Must the sentence of death be vacated as the result of passion, prejudice, or other arbitrary factors?

■ Did the trial court's sentences on the reckless endangerment counts constitute illegal sentences?

■ Did the trial judge err in not recusing himself from deciding post-sentence motions?

■ Does lethal injection constitute cruel and unusual punishment in violation of the Eighth Amendment?

Appellant's Brief at 5.

affirm the sentence of death unless we determine that (1) it was "the product of passion, prejudice or any other arbitrary factor," or (2) "the evidence fails to support the finding of at least one aggravating circumstance specified in [42 Pa.C.S. § 9711(d)]." 42 Pa.C.S. § 9711(h)(3). Furthermore, in all capital cases, we have self-imposed a duty to conduct an independent review of the sufficiency of the evidence to sustain a conviction for first-degree murder. *See, e.g., Commonwealth v. Pruitt,* 597 Pa. 307, 951 A.2d 307, 313 n. 4 (2008). These safeguards are not abandoned when a defendant has pled guilty to first-degree murder. *See Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 62 (2003) (noting that the safeguards discussed *supra* "act to prevent the imposition of a death sentence based solely upon a defendant's proclamation of guilt"); *see also Commonwealth v. Singley,* 582 Pa. 5, 868 A.2d 403, 408 (2005) (in a multiple murder case where the appellant pled guilty to one count of first-degree murder, relying on the evidence presented at the guilty plea and degree of guilt and penalty phase hearings to conclude that the evidence was sufficient to establish that the appellant had intentionally stabbed his victim to death).

In order to sustain Appellant's first-degree murder plea, we must conclude that the evidence proved beyond a reasonable doubt the following three elements: (1) that Officer Gregg was unlawfully killed; (2) that Appellant is responsible for the killing; and (3) that Appellant acted with a specific intent to kill, *i.e.,* in a willful, deliberate, premeditated way. *See Pruitt, supra* at 313, 951 A.2d 307.

We have reviewed in detail the notes of testimony from Appellant's penalty phase hearing in order to determine if the evidence was sufficient to establish these elements. The penalty phase hearing, which was conducted before a jury, was remarkably thorough. The Commonwealth presented more than forty witnesses, including Officer Warunek; Mr. Epp; numerous patients, and their family members, who were seeking treatment at the emergency room when the shooting took place; many medical center employees who were on duty in the emergency room during the shootings; and several police

officers who assisted in re-apprehending and detaining Appellant after the shootings. As summarized in the following paragraphs, the evidence in support of Appellant's guilt of the first-degree murder of Officer Gregg was not merely sufficient, but compelling.

Officer Warunek testified that, as he was attempting to re-handcuff Appellant in the emergency room after getting his urine sample, Appellant successfully grabbed the officer's gun and immediately shot him point-blank in the chest. N.T., 11/6/06, at 217–22. Mr. Epp, the emergency room technician who also was shot, testified that he first saw Appellant as the officers were bringing him into the emergency room for blood alcohol testing, and that Officer Gregg identified the suspect as Robert Flor. N.T., 11/8/06 at 18–20, 26. Mr. Epp further testified that, after he and the officers had been wounded, he observed Appellant walk over to Officer Gregg, who was lying on the floor, put the gun to the officer's head, and fire two shots. *Id.* at 23. Dr. Bert Blackstone, who was the trauma surgeon on call at St. Mary Medical Center on the day of the shootings, testified that the shots to Officer Gregg's head caused massive and fatal brain injury for which no medical intervention was possible. *Id.* at 40, 41, 43–45; *see also* N.T., 11/10/06, at 127, 131–32, 145 (testimony of forensic pathologist Dr. Ian Hood, who performed an autopsy on Officer Gregg's body, that either of the two gunshot wounds that Officer Gregg sustained to his head would have been rapidly fatal).

Several other employees of the hospital on duty in the emergency room during the shootings testified as to their observations. Ms. Laura Chichilitti, the emergency room receptionist, testified that she registered Appellant after Officers Gregg and Warunek brought him into the emergency room, and that she subsequently heard shots and then saw Appellant run from the emergency room. N.T., 11/8/06, at 190–195. Ms. Kathy Rowland, another receptionist, testified similarly that she observed Appellant being brought into the emergency room by the officers, subsequently heard gunshots, and then saw him run from the facility. *Id.* at 201–02. Ms. Cindy O'Boyle, a physician's assistant, testified that she drew

blood from Appellant for his blood alcohol test and then directed the officers to the lavatory for collection of Appellant's urine sample. Shortly thereafter, Ms. O'Boyle testified, she heard gunshots and then met Appellant's gaze as he pointed a gun at her. Finally, she testified that she saw Appellant point the gun at Officer Gregg, who was lying on the floor, and then shoot him in the head. N.T., 11/9/06, at 35–36, 38–42.

The emergency room was full of patients seeking medical treatment, and their family members, when the shootings took place, and many of these individuals testified at the penalty phase hearing as to what they saw and/or heard. For example, Ms. Karen Heller, a patient, testified that she saw the officers bringing Appellant into the emergency room, heard gunshots, and then saw Appellant drop a gun and go out the doorway of the facility. *Id.* at 9–12. Even more compellingly, Ms. Heller's husband, Mr. Peter Heller, who was waiting with his wife, testified that he observed Appellant grab Officer Warunek's gun, start shooting at the officers, and then return to Officer Gregg on the floor and shoot him in the head while saying "Fuck you pig." *Id.* at 20–26.

Several police officers testified as to their interactions with Appellant following the shootings, *i.e.*, during his re-apprehension and re-arrest, or as they were guarding him during the treatment of his hand wound. Officer Glenn McPhearson testified that he found Appellant, wearing bloody jeans and lying in a car parked in the garage of the hospital, shortly after the shootings. *Id.* at 153–57. Officer Stephen Forman testified that, while Appellant was being treated for his hand injury, he stated that the two officers "got what they fucking deserved," and they should not have "fucked" with him. *Id.* at 182. Officer Forman also testified that Appellant made the following comment regarding his weapons training: "two in the chest, one in the head. Basically, it works every time." *Id.* In addition, Officer Forman testified that Appellant told him that he "put two in [Officer Gregg's] head." *Id.* at 183.

Officer Michael Stum, who was also on the scene during Appellant's re-apprehension and medical treatment, testified

that he wrote down Appellant's comments during this period of time. *Id.* 189. Officer Stum's notes of Appellant's comments included the following: "They got what they fucking deserved.... I was always taught two in the chest, one in the head.... I'll be back for you [to a member of the medical team].... I'll get my hands on you. You'll be the next on my death list [to a member of the medical team]." *Id.* at 189–91. Finally, Officer Stum's notes included Appellant's statement as to his shooting of Officer Gregg: "As the other [Officer Gregg] went for his gun, I shot him. And then when he went down I went up and put two in him." *Id.* at 191–92.

The testimony of several medical personnel who treated Appellant's hand injury was similar to that of the law enforcement personnel. Dr. Blackstone testified that as he was treating Appellant, Appellant made a very inflammatory comment to the effect that he wished or hoped that he had killed more cops. N.T., 11/8/06, at 63–64, 66. Mr. Joseph White, an emergency room technician, testified that Appellant kept repeating "die pig" and said that he was sorry he had run out of bullets. N.T., 11/9/06, at 112–14. Mr. Charles Kunkle, the emergency room nurse manager who drew blood from Appellant, testified that he heard Appellant say that the "young punk got what he deserved." *Id.* at 121. Mr. Brian Murray, an emergency room clerk, testified that Appellant stated he wished he could have killed more police and that the officers deserved to die. N.T., 11/8/09, at 161–63. Ms. Pamela LaPorte, an emergency room technician, testified that she conversed with Appellant as she was treating him, and asked him if he realized that he had just shot and killed a police officer; Appellant responded that he knew that and he would do it again. N.T., 11/9/06, 172–73.

This evidence, gathered from numerous witnesses, makes clear beyond any reasonable doubt that Appellant fatally shot Officer Gregg in the head at close range in a willful, deliberate, pre-meditated way. Appellant's own actions and words, respectively observed and heard by numerous witnesses, leave no doubt that his intent was to kill the officer. There is

absolutely no question that the evidence was sufficient to find Appellant guilty of the first-degree murder of Officer Gregg.

We now turn to Appellant's issues, which we have reordered for ease of disposition.

### Competency to Stand Trial

Appellant first contends that the trial court's finding that he was competent to stand trial was erroneous. We have recently summarized the principles relevant to our review of a competency determination as follows:

A defendant is presumed to be competent to stand trial. Thus, the burden is on the defendant to prove, by a preponderance of the evidence, that he was incompetent to stand trial. In order to prove that he was incompetent, the defendant must establish that he was either unable to understand the nature of the proceedings against him or unable to participate in his own defense.

Stated otherwise, the relevant question in a competency determination is whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings.

We extend great deference to the trial judge's determination as to competency because he or she had the opportunity to observe directly a defendant's behavior. Furthermore, we note that it is a proper exercise of the trial court's discretion to accept one expert witness's opinion over that of a conflicting opinion where the record adequately supports such a resolution.

*Pruitt,* 951 A.2d at 316 (internal citations and quotation marks omitted).

This Court has made clear that there is a distinction between whether a defendant is *unable* to cooperate with his counsel and whether a defendant *chooses not* to cooperate. *Commonwealth v. Logan,* 519 Pa. 607, 549 A.2d 531, 540 (1988). The issue in a competency determination is whether

the defendant is able to cooperate with counsel, not whether he is actually cooperating. *Id.* (citation omitted).

█ In the instant case, the trial court held a competency hearing prior to finding Appellant competent to stand trial. Three witnesses testified for the defense: Dr. David Starkey, a psychologist who was the director of mental health at Bucks County Correctional Facility and who, in that professional capacity, had interviewed Appellant on numerous occasions; Dr. Richard Saul, a psychiatrist retained by the defense who had spoken with Appellant on only one occasion for ten or fifteen minutes, after which Appellant had walked out of the room, making clear that he did not wish to speak to a psychiatrist; Dr. Pogos Voskanian, a psychiatrist retained by the defense who had interviewed Appellant on several occasions, primarily to assess mitigation factors. The Commonwealth called one expert witness, Dr. Timothy Michals, a forensic psychiatrist who had evaluated Appellant for competency at the request of the Commonwealth. All of the witnesses at the competency hearing agreed that Appellant suffered from a depressive disorder, but only two witnesses—Drs. Saul and Voskanian—opined that Appellant was not competent to stand trial.

The court outlined in considerable detail its reasons for declining to accept the opinion of Drs. Saul and Voskanian, and for concluding, to the contrary, that Appellant was competent to stand trial. *See* N.T. Competency Hearing, 10/13/06, at 147–55. The court first made clear that competence is a legal concept, requiring the fact-finder to determine whether the defendant understood the nature of the proceedings and was able to cooperate with counsel and participate in his or her defense. *Id.* at 148–49. The court then reviewed the testimony of each expert witness, as it related to these questions. The court concluded as follows:

I don't see this as a situation where [Appellant] is incapable of cooperating. Clearly, he has the full capability to cooperate with his counsel. Instead[,] what is abundant and palpable is that he does not wish to cooperate with his counsel, and I assure you, there is a clear distinction

between the present ability to do so and the absolute refusal to do so.

[Appellant] knows he's the defendant. He can recite the details, as much as he'd like to reveal, with regard to the crime. He knows the charge is first[-]degree murder. He knows that he is charged with killing Officer Gregg and shooting two others.

There is nothing about this that [Appellant] doesn't understand. He appreciates the function of the Court. He knows what a judge does. He's aware of who the District Attorney is. He knows that a jury decides this case. Knowing all that, he refuses to cooperate with counsel, and that is far different from being incapable of cooperating with counsel.

One thing which does not appear of record, but which as the finder of fact I will place of record[,] is the following: For approximately four hours in court from my vantage point I had the opportunity to observe [Appellant]. During the testimony of all the witnesses[,] his gaze was fixed upon them. He was not staring off into space. He was looking at them, and we assume listening intently.

During the course of these proceedings[,] seated to his immediate left was [defense counsel]. [Appellant] spoke with [his counsel] during the course of these proceedings, and while we do not know the nature of that conversation, nor should we inquire about it, it's clear that he was able to carry on a conversation with his attorney when he chose to do so.

We have to make a decision as to whether he is competent based on the law and the facts, but that decision is not to be made in a vacuum. It's not to be made devoid of reason and common sense.

Does [Appellant] understand the nature of the proceedings? Clearly, the evidence is compelling.

Is he able to cooperate with his counsel? Absolutely.

Can he participate in his defense? Without question.

Does he choose to do so? It seems that he does not. It doesn't make him incompetent.

We'll note that every defendant is presumed to be competent. It is the burden of the defense to prove that he is incompetent. The evidence presented on [Appellant's] behalf is woefully insufficient to carry that burden, even by a preponderance of the evidence.

We find clearly, without any hesitation, that [Appellant] is competent. He understands the charges. He understands the nature of the proceeding. He recognizes his position as the defendant. More importantly, he knows the punishment he faces. He knows the potential outcome of this case. He knows full well what the functions of his counsel are, he just chooses, for whatever reason, to reject them.

Now, I think the defense would have us accept [that,] as a bright line test, a statement of a defendant that he wishes to die must, therefore, indicate that he is incompetent, and nothing could be further from the truth. Given the circumstances and the theory known only to [Appellant], that may be the most rational response.

N.T. Competency Hearing, 10/13/06, at 151–54.

Despite the trial court's thorough analysis, *supra*, Appellant insists that, although he understood the proceedings against him, he was unable to assist in his own defense because of a major depressive disorder, which affected his decision-making ability and resulted in his lack of cooperation with his counsel.[4] Appellant's Brief at 18–19. In essence, Appellant simply disagrees with the way the trial court weighed the evidence as to his competency and the court's ultimate determination based on that evidence, and he asks this Court to reconsider the matter anew. That we will not do. The trial court has provided a well-articulated and indeed compelling rationale, grounded in the evidence, for its finding of competency, and we will not disturb the trial court's determination.[5]

4. However, even Appellant acknowledges that, once jury selection was underway for the penalty phase of the proceedings, he did cooperate in the presentation of mitigation evidence. *See* Appellant's Brief at 21–22.

5. We also note that Appellant's contention that the trial court misapplied the test for competency is flatly contradicted by the record. *See*

### Continuance

■■■ In Appellant's second issue, he contends that the trial court erred by refusing to grant a continuance so that Appellant could undergo further psychiatric testing. *See* Appellant's Brief at 26. Appellant sought the continuance on October 24, 2006, the day after he pled guilty to the first-degree murder of Officer Gregg and the first day of *voir dire* for the penalty phase proceedings.

■■■■■ A decision to grant or deny a continuance rests within the sound discretion of the trial court. *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666, 682 (1999). We will not reverse a trial court's decision absent a showing of abuse of that discretion or prejudice to the defendant. *Id.; Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 476 (1998). "[A]n abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Commonwealth v. Randolph,* 582 Pa. 576, 873 A.2d 1277, 1281 (2005) (citations and internal quotation marks omitted). "In reviewing the denial of a continuance, we have regard for the orderly administration of justice as well as the right of a criminal defendant to have adequate time to prepare his defense." *Small, supra* at 682–83.

Appellant's request for a continuance was specifically premised on his contention that he required more time for completion of neuropsychological testing. *See* N.T., 10/24/06, at 20. Although Appellant had previously and repeatedly refused to cooperate in being tested, he apparently changed his mind, and neuropsychologist Dr. Jonathan Mack accordingly initiated the testing a few days before the start of *voir dire. See* Appellant's Brief at 27; N.T., 10/24/06, at 21–22. Defense counsel argued that because Dr. Mack had advised that fur-

Appellant's Brief at 17. The court made clear its correct understanding that, to be found competent, a defendant must be able to understand the nature of the proceedings against him **and** to participate in his defense. *See* text explaining the trial court's reasoning, *supra.*

ther testing was indicated, a continuance was necessary to allow for completion of the testing. N.T., 10/24/06, at 20–27. In response, the Commonwealth pointed out that it was Appellant who was the cause of any delay in completing Dr. Mack's battery of tests. In addition, the Commonwealth indicated that it had no objection to accommodating Dr. Mack's schedule in order to allow on-going testing concurrent with the initiation of *voir dire*. *Id.* at 27–28. The trial court concluded that it saw "no reason why we can't begin to *voir dire* jurors and simultaneously . . . have that testing occur." *Id.* at 28. Thus, although the trial court denied Appellant's motion for a continuance, the court did not deny him the opportunity to carry out the testing that was his stated rationale for seeking the continuance. *Id.* at 29.

Furthermore, as the trial court points out, Appellant's case was heard more than one year after the offenses were committed, and the same three defense attorneys had represented him throughout all the proceedings. Trial Court Opinion, dated July 5, 2007, at 50. Appellant's trial was originally scheduled for February 27, 2006, but at the request of defense counsel, the court granted a continuance until April 17, 2006, in order to allow additional time for preparation. At the end of March 2006, the district attorney had a serious health emergency, and it was necessary to reschedule the trial again, by mutual agreement, to the end of October 2006. *Id.* at 49–50. Defense counsel acknowledged that Appellant had refused to submit to neuropsychological testing for several months, from August 2006 until October 2006. N.T., 10/24/06, at 21. Thus, the record demonstrates that (1) the court had granted a request for a continuance made by Appellant months earlier; (2) Appellant had had nearly a year to prepare his defense, in which preparation he was assisted by the same attorneys; (3) Appellant was the cause of any delay in completion of the neuropsychological testing, and (4) the court's order, despite denying the continuance, still accommodated Appellant's request to complete the testing.

Nonetheless, Appellant insists that, because the court did not grant a continuance, "trial counsel was unable to inquire

during *voir dire* whether potential jurors would give due consideration to their [sic] mitigation, as they were not yet aware of the full extent of mitigation," and that he "was deprived of the opportunity to question potential jurors regarding specific mitigation, which ultimately led to a jury that refused to find any mitigating factors, despite days of unrebutted evidence regarding mitigation." Appellant's Brief at 29. Appellant does not explain or develop these assertions, which in any event must fail because they have no support in the record.

When the penalty phase proceedings began, Appellant had already been interviewed by four mental health experts: two psychiatrists who were retained by the defense, one of whom was retained specifically as a mitigation expert, *see* N.T., Competency Hearing, 10/13/06, at 88; a psychologist, who was the director of mental health at the correctional facility where Appellant was being held; and a forensic psychiatrist who was retained by the Commonwealth. *See* text, *supra,* Issue 1. All of these individuals had testified at Appellant's competency hearing, which was held on October 13, 2006, eleven days before he sought a continuance. Therefore, there is no question that, well before the beginning of the penalty phase proceedings, defense counsel had extensive information regarding Appellant's mental health and any potentially applicable mitigating factors that might be grounded in his mental health history and status.

During *voir dire,* defense counsel consistently asked prospective jurors about their ability to consider and take into account mitigation evidence, including mental health history, as shown by the following examples:

*Defense Counsel:* Aggravating circumstances, or factors, are those facts which would under the law warrant the possibility of the imposition of the death penalty.

Mitigating factors, on the other hand, are those circumstances which would warrant a jury [sic] a sentence of life without parole. Are you following what I'm saying?

*Potential Juror:* Yes, sir.

*Defense Counsel:* Again, [a] mitigating circumstance under the law can be any factor offered by the defense to support a life sentence if the juror finds it. They include, but are not limited to, background, age, *mental health,* any other evidence of mitigation concerning the character or the record of a circumstance of the defendant.

Given what I've told you, do you feel that if you were selected as a juror in this case, knowing that [Appellant] is guilty of a crime that I've described and discussed, would you be able to truly consider the evidence of mitigation that we might offer on his behalf?

N.T., 10/24/09, at 110–11 (emphasis added).

*Defense Counsel:* There may be some testimony—there will probably be some testimony in this case offered by *psychologists* and maybe a *psychiatrist*[;] do you have any views or opinions of your own about those professions that would make you disregard *psychological* or *psychiatric testimony?*

*Potential Juror:* No, sir.

*Id.* at 113 (emphasis added).

Appellant has not provided the slightest suggestion as to how or why the completion of Dr. Mack's neuropsychological testing prior to the initiation of *voir dire* would have led to any change in defense counsel's questions to potential jury members or strategy during *voir dire.* Appellant has failed to suggest a single specific question that went unasked due to the incomplete status of Dr. Mack's neuropsychological testing at the time of *voir dire.* Accordingly, Appellant has utterly failed to establish that he suffered any prejudice due to the initiation of *voir dire* prior to the completion of neuropsychological testing.

In sum, from our thorough review of the record, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a continuance, that Appellant suffered no prejudice from the denial of his motion, and that Appellant had ample time to prepare his case, including the full development of any evidence from neuropsychological testing.

### Evidence of Prior Violent Felony Convictions

In Appellant's third issue, he contends that the trial court erred by admitting certain evidence related to the circumstances surrounding his prior violent felony convictions, which the Commonwealth offered to support the applicability of the prior violent felony aggravation factor. *See* 42 Pa.C.S. § 9711(d)(9). The felonies at issue were Appellant's 1990 conviction for aggravated assault against one Rick Dooley, and Appellant's 1994 guilty pleas in six aggravated assault counts against three police officers, to wit, John McKenna, Jim Moratti, and Mike Phillippe. With regard to these prior assaults, Appellant specifically sought to exclude five items of evidence: (1) Appellant's verbal threats against Mr. Dooley, made immediately prior to and shortly after the assault; (2) Appellant's assault of his then-girlfriend Rhonda Bealer, which brought police to Appellant's home just prior to his assault of the officers; (3) Appellant's assault of Officer Neal Harkins with a baseball bat, which was not charged; (4) Appellant's attempt to take Officer McKenna's gun, which was not charged; and (5) Appellant's verbal threats against police officers made immediately after he was taken into custody for assaulting the officers. Appellant argues that the trial court improperly admitted all this evidence because it included non-felony and non-charged offenses, went beyond the facts necessary to establish the circumstances of Appellant's violent felony convictions, and was excessive, inflammatory, and prejudicial. Appellant's Brief at 47. Appellant is incorrect.

In *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460, 465 (1984), this Court explained that a jury's role in sentencing a first-degree murder defendant crucially includes an analysis of the defendant's character, and prior convictions may be admissible as evidence because they provide such insight.

> In this Commonwealth, sentencing has long been regarded as having at its core a function of character analysis, and the central idea of the present sentencing statute is to allow a jury to take into account such relevant information, bearing upon a defendant's character and record, as is applicable to the task of considering the enumerated aggravating

circumstances. Consideration of prior "convictions" was not intended to be a meaningless and abstract ritual, but rather a process through which a jury would gain considerable insight into a defendant's character. The nature of an offense, as ascertained through examination of the circumstances concomitant to its commission, has much bearing upon the character of a defendant, and, indeed, without reference to those facts and circumstances, consideration of "convictions" would be a hollow process, yielding far less information about a defendant's character than is relevant. *Id.* (internal citation omitted).

Thus, the jury not only should, but indeed **must** know more than the mere fact of conviction if it is to carry out its sentencing role properly. *See Commonwealth v. Young,* 536 Pa. 57, 637 A.2d 1313, 1320 (1993); *see also Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 814 (2007) (quoting *Commonwealth v. Marshall,* 537 Pa. 336, 643 A.2d 1070, 1074 (1994) for the proposition that "[t]he jury simply cannot perform its function in ignorance of the facts of the crime for which [the defendant] is being sentenced, or the crimes for which he has previously been convicted, to the extent that those crimes may properly support the existence of aggravating circumstances provided in Section 9711(d)"). Accordingly, the sentencing court is not required to limit evidence of the defendant's prior violent felony conviction to "a certified record and sanitized summary of the circumstances of the prior crimes." *Young, supra* at 1320.

Consistent with the above principles, this Court has held that, "in the penalty phase of the trial, the prosecution is permitted to examine the facts surrounding a defendant's previous felony convictions **so that a jury may assess whether these prior crimes involved violence sufficient** to support the aggravating circumstance in 42 Pa.C.S.A. § 9711(d)(9)." *Commonwealth v. Sattazahn,* 563 Pa. 533, 763 A.2d 359, 365 (2000) (emphasis added); *see also Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 851 n. 16 (2003) ("It is well settled [ ] that the Commonwealth may place the underlying facts of prior convictions introduced pursuant to [S]ection 9711(d)(9)

before the jury at the penalty phase **so that the jurors may assess the weight** to be given to the convictions." (emphasis added)).

The admissibility of evidence is within the sound discretion of the trial court, wherein lies the duty to balance the evidentiary value of each piece of evidence against the dangers of unfair prejudice, inflaming the passions of the jury, or confusing the jury. *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (2007); *Marshall, supra* at 1073–74. We will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 416 (2003).

Several practical examples of the above principles are relevant to the instant case. In *Beasley, supra* at 465, we held that the trial court committed no error in admitting testimony that one of the appellant's prior convictions, for which he had been sentenced to death, was for the murder of a police officer. In *Bomar, supra* at 851 n. 16, the appellant argued that the trial court had erred in allowing testimony concerning the details of his prior conviction for battery by a prisoner, specifically, that the appellant had attacked a female visitor from behind, struck her in the face and body several times with his hands and feet, and shouted obscenities at her. We concluded that the trial court had not erred in admitting these underlying facts of the prior conviction into evidence. *Id.* Similarly, in *Rios, supra* at 814, the appellant objected to testimony that detailed the circumstances of his prior convictions, *i.e.*, that he had broken into an apartment, hit the occupant with a sawed-off shotgun, tied him up and burned him, demanded money, and threatened to kill him. We held that it was "perfectly consistent with the law of this Commonwealth for the court to allow details of [the defendant's] prior crimes to establish the significant history [of violent felonies] aggravator." *Id.* at 815. In *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994), the appellant was convicted of the first-degree murder of a 74-year old woman, and during the penalty phase of trial, the Commonwealth offered evidence of

the appellant's prior record of previous convictions, which included two aggravated assaults. On appeal, the appellant argued that the trial court had erred by allowing testimony that in one of the prior assaults, the appellant had used a knife and her victim was a 71–year old man. We concluded that the appellant was entitled to no relief because such facts were properly placed before and weighed by the jury. *Id.* at 720.

In the instant case, based on the above precedents, we conclude that the trial court did not abuse its discretion in admitting evidence as to the circumstances surrounding Appellant's prior assault convictions. Contrary to Appellant's assertions, none of the witnesses's testimony suggested that Appellant had been charged with or convicted of misdemeanor or additional felony offenses, other than the aforementioned aggravated assaults against Mr. Dooley and the three police officers. The jury was properly informed that Appellant had verbally threatened the lives of Mr. Dooley and the officers, as such threats provide insight into the gravity of Appellant's aggravated assaults, his intent, and his character.[6] The jury

6. Appellant also asserts that the threats against Mr. Dooley and the officers did nothing to aid the jury's understanding of the assaults—and thus should not have been admitted—because the threats were not made contemporaneously with the assaults. We cannot agree. Appellant's threats against Mr. Dooley before and shortly after the assault provide further insight into Appellant's intent to cause Mr. Dooley serious bodily harm—if not to kill him. Appellant's threats against the officers took place shortly after he was taken into custody, and they reveal a hostile and threatening attitude toward police officers that not only reinforces the gravity of the prior assaults, but also has similarities to Appellant's demeanor toward police officers after Officer's Gregg's murder. Appellant's assertion that his threats against Mr. Dooley and the officers would not aid the jury's understanding of his aggravated assault convictions is factually mistaken and legally unsupportable.

In addition, Appellant contends that the evidence of his threats against Mr. Dooley was cumulative because it had already been the subject of testimony by two witnesses. Appellant has ignored the fact that the testimony of the prior two witnesses referred to threats made at different times. Mr. Dooley testified to the threats Appellant made against him prior to assaulting him. *See* N.T., 11/9/06, at 161. In contrast, the other witness, Mr. Forko, testified that shortly after the assault, Appellant stated that he had just stabbed Mr. Dooley, that he should have killed Mr. Dooley, and that he wanted to finish the job. N.T., 11/10/06, at 105–06. Contrary to Appellant's assertions, the testimony of Mr. Dooley and Mr. Forko was not cumulative.

was properly informed that Ms. Bealer had facial injuries and was very upset when police responded to the report of a domestic dispute involving her and Appellant at his residence. The domestic dispute was the reason for the police officers' appearance at Appellant's residence, and the officers' immediate intervention was guided by what they observed on the scene. Without knowing the context provided by these facts, the jury could not fully understand the assaults on the officers that soon followed. In addition, the jury was properly informed that Appellant had struck Officer Harkins with a baseball bat, even though Appellant was not charged with assault against Officer Harkins. Appellant's actions on the scene with a baseball bat—a potentially deadly weapon—constituted a relevant aspect of the sequence of events that transpired during the aggravated assaults on the responding officers, and further supported the violent nature of the encounter. Finally, the jury was properly informed that Appellant had attempted to grab Officer McKenna's firearm, even though Appellant was not charged with attempting to disarm the officer in that incident. Appellant's attempt to grab Officer McKenna's firearm not only suggests the extremely serious and violent nature of Appellant's prior aggravated assaults against the officers, but it also has a relevant similarity to Appellant's actions just before he murdered Officer Gregg.

In sum, contrary to Appellant's assertions, the specific and descriptive testimony as to Appellant's history of violent felonies was properly placed before the jurors to inform them of the circumstances surrounding Appellant's prior convictions, and thus to aid them in assessing the weight that these prior offenses should be accorded in the context of the Section 9711(d)(9) aggravating factor.

### Aggravating Circumstances

In Appellant's fourth issue, he contends that four statutory provisions setting forth aggravating circumstances, *i.e.*, 42 Pa.C.S. § 9711(d)(1), (d)(6), (d)(7), and (d)(9), are unconstitutional as applied in his case. In Appellant's fifth issue, he

relies on his arguments in issue four to assert that none of the aggravating circumstances proffered by the Commonwealth was properly before the jury, and hence the evidence was necessarily insufficient to support a verdict of death.

Appellant has waived his claims as to the subsection 9711(d)(1), (d)(6), and (d)(7) aggravating circumstances. With respect to subsections (d)(1) and (d)(6), Appellant contends that the trial court's jury instructions essentially directed the jury to find these aggravating circumstances. With respect to subsection (d)(7), Appellant contends that the trial court erroneously failed to instruct the jury regarding the "zone of danger," and improperly directed the jury to consider Appellant's intended victims as fulfilling subsection (d)(7)'s requirement that the defendant "knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7). In each of these cases, Appellant failed to object to the relevant jury instructions. Accordingly, these claims are waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Diggs*, 597 Pa. 28, 949 A.2d 873, 881 (2008) (in a direct capital appeal, concluding that the appellant waived his claim of trial court error with respect to the jury charge because counsel did not raise any contemporaneous objection to the charge).

With regard to subsection 9711(d)(9) (significant history of violent felony convictions), Appellant contends that this aggravating circumstance was unconstitutional as applied because the trial court improperly allowed the Commonwealth "to present extraneous information regarding uncharged allegations which were highly inflammatory." Appellant's Brief at 68. Appellant specifically refers to the same evidence as has been discussed *supra* under Issue 3. We addressed the admissibility of this evidence thoroughly in Issue 3, and see no need to repeat the analysis here. The claim has no merit, and Appellant is entitled to no relief.

### Jury's Failure to Find Mitigating Circumstances

In Appellant's sixth issue, he contends that the jury's finding of no mitigating circumstances was against the weight of

418

the evidence. *See* Appellant's Brief at 44. Similarly, in Appellant's seventh issue, he contends that the jury's sentence of death, based on its finding of no mitigating circumstances, violated his constitutional rights because the jury ignored and failed to give effect to his extensive evidence of mitigation. *Id.* at 30, 42–43. Appellant grounds his sixth and seventh issues in the same argument, to wit, the following: the jury's finding of no mitigating circumstances, despite "unrebutted" evidence of his difficult childhood, intoxication, brain damage, mental illness, emotional disturbance, cognitive impairment, and inability to conform his actions to the requirements of the law, as testified to by several family members and three mental health professionals, demonstrates that the jury refused to consider this evidence and did not weigh it properly. *See id.* at 43, 44. There is no merit to Appellant's argument.

As this Court has expressly articulated, "[a] capital jury is not required to find a mitigating factor presented by a defendant, even if the Commonwealth fails to present evidence rebutting the existence of that factor." *Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 568 (2009). In more general terms, the fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber,* 582 Pa. 646, 874 A.2d 26, 30 (2005); *Commonwealth v. Williams,* 578 Pa. 504, 854 A.2d 440, 445 (2004). It follows directly from the above principles that a jury is not obliged to believe testimony, including expert medical or psychiatric testimony, offered by a defendant. *See Commonwealth v. VanDivner,* 599 Pa. 617, 962 A.2d 1170, 1177 (2009); *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 939 (1990). Furthermore, the weight to be ascribed to any testimony is a determination that rests exclusively with the finder-of-fact. *Treiber, supra* at 30; *Williams, supra* at 445.

We have also made explicitly clear that an appellate court cannot substitute its judgment for that of the fact-finder:

It is axiomatic that once a jury has been properly instructed on the nature of aggravating and mitigating circumstances

as defined in the statute, as well as on the statutory scheme for balancing one against the other, it is not for reviewing courts to usurp the jury function and to substitute their judgment for that of the jury.

*Treiber, supra* at 30–31 (citation omitted).

In our sentencing procedures for first-degree murder, the defendant has the burden of proving mitigating circumstances by a preponderance of the evidence. 42 Pa.C.S. § 9711(c)(1)(iii). The mitigating circumstances that Appellant sought to prove in the instant case were the following:

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to … conform his conduct to the requirements of law was substantially impaired.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

42 Pa.C.S. § 9711(e)(2), (3), and (8).

Subsection 9711(e)(8) is known as the "catch-all" mitigator, as it may encompass a wide range of evidence, including life history, mental health status, physical or psychological abuse, childhood neglect, substance abuse, etc. *See Commonwealth v. Reyes,* 600 Pa. 45, 963 A.2d 436, 440 & n. 4 (2009); *Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523, 547 (2006); *Commonwealth v. Marinelli,* 570 Pa. 622, 810 A.2d 1257, 1274–77 (2002); *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 723 (1992); *Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689, 698 (1986) ("At sentencing, the defendant is free to introduce any evidence in mitigation which might persuade the sentencer to be lenient in determining his penalty.")[7]

7. Although Appellant repeatedly asserts that his voluntary intoxication and substance abuse were mitigating circumstances, he does not specify if he is relying on subsection 9711(e)(3) (the inability to conform conduct to law mitigator) or subsection 9711(e)(8) (the catchall mitigator) for this assertion. *See* Appellant's Brief at 33, 35, 40, and 43. With regard to voluntary intoxication as a potential mitigating circumstance under subsection 9711(e)(3), this Court has applied a stringent

420

██ In the instant case, as the trial court points out, Appellant offered evidence to prove that he had brain damage, mental impairments, emotional disturbances, a background of abuse and neglect, and impairments caused by alcohol and drugs. Trial Court Opinion at 57. However, the trial court did not accept Appellant's assertion that the mitigating evidence was undisputed, and after careful review of all the testimony relevant to mitigation, we conclude that the record supports the trial court's determination. Furthermore, Appellant seemingly ignores the principles that the jury is free to believe all, part, or none of the evidence; is solely responsible for making credibility determinations; and bears the responsibility for determining the existence of mitigating factors. *See Walter, supra* at 568; *Treiber, supra* at 30–31. Based on these reasons, which we develop in more detail below, first considering the mitigation testimony of Appellant's family members and then of his expert witnesses, we conclude that Appellant is entitled to no relief.

Appellant called several family members—his mother, grandmother, sister, and step-brother—as witnesses to testify as to his difficult childhood. The picture of Appellant's childhood that emerged from the testimony of these witnesses was dominated by a series of chaotic, stressful, dysfunctional households. Appellant's biological father was absent from Appellant's life, and Appellant was raised by his mother, a

standard: "the evidence would have to show that the [defendant] was overwhelmed or overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill." *Marinelli,* 810 A.2d at 1277 (citation omitted). Thus, the standard applicable for proving a claim of voluntary intoxication is the same in the guilt phase and penalty phase. *See id.* (citing *Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1268 (1992)).

There is absolutely no evidence that, at the time of Officer Gregg's murder, Appellant was so intoxicated as to be incapable of forming a specific intent to kill. Indeed, his guilty plea to first-degree murder is entirely incompatible with such a determination. Furthermore, under cross-examination, Dr. Tepper, one of Appellant's own expert witnesses, acknowledged that Appellant fully intended Officer Gregg's death at the time he pulled the trigger. N.T., 11/16/06, at 66.

Based on the above reasoning, in the text, *infra,* we address Appellant's arguments for voluntary intoxication and substance abuse as mitigating circumstances **only** under subsection 9711(e)(8), the catchall mitigator.

series of four step-fathers, and his grandmother. Appellant began to use alcohol at an early age, and his grandmother reported an incident, disputed by other family members, of Appellant's sexual abuse by one of his step-fathers. The family witnesses also provided evidence of mental health problems suffered by various members of the family, including Appellant. Nonetheless, Appellant's step-brother, who was fathered by Appellant's second step-father, testified that the family "had a lot of good times" with his father. N.T., 11/13/06, at 89; *see id.* at 91 (same). On cross-examination, Appellant's step-brother also testified that Appellant was "an angry individual" and "a mean drunk." *Id.* at 96. Although the family witnesses did not agree on every detail, their testimony in its entirety generally supports Appellant's assertion that his childhood was marked by problems and lacking in parental guidance.

Nonetheless, even assuming that the jury found much of the testimony of the family witnesses credible, nothing in our statutory or decisional law required the jury to conclude that Appellant's difficult childhood rose to the level of a mitigating circumstance with regard to the murder of Officer Gregg, a brutal crime that Appellant committed at 38 years of age. It was for the **jury**—not Appellant and not this Court—to decide whether Appellant's difficult childhood constituted a mitigating circumstance. *See Walter, supra* at 568 ("The law is clear that the task of determining the existence of mitigating factors is for the jury alone.") Contrary to Appellant's contention, the fact that the jury did not find a mitigating circumstance grounded in Appellant's early life history does not constitute evidence that the jury ignored or improperly weighed the testimony of the family witnesses. Rather, it was properly within the jury's discretion as fact-finder to reject that testimony. *See id.; Treiber, supra* at 31.

After the testimony of the family witnesses, the following three mental health experts, who had been retained by Appellant, then testified: (1) Dr. Jonathan Mack, a neuropsychologist and forensic psychologist who, in the weeks prior to the penalty hearing, subjected Appellant to an extensive neurop-

sychological evaluation to determine if brain damage was present, and the extent and effect of any such damage, N.T., 11/13/06, at 100–05, 109–10; (2) Dr. Pogos Voskanian, a physician certified in psychiatry and forensic psychiatry who conducted a psychiatric evaluation of Appellant involving four personal interviews, beginning in October 2005, as well as interviews of Appellant's mother and grandmother, and review of relevant records and collateral information, N.T., 11/14/06, at 74–75, 81–83; and (3) Dr. Alan Tepper, a psychologist and attorney, who conducted a psychological evaluation of Appellant a few weeks prior to the penalty hearing, and reviewed background materials to assess possible mitigation factors. *Id.* at 158, 163–64.

All three of the mental health experts concluded that Appellant suffered from one or more mental illnesses. Their diagnoses, which were not identical but did overlap, included the following: major depressive disorder, severe without psychotic features; bipolar disorder, manifesting predominantly as depression; dementia; personality change due to brain damage (also known as organic personality syndrome) of the labile, disinhibitive, and aggressive type; post-traumatic stress disorder, related to various childhood traumas; and personality disorder, not otherwise specified. All the experts recognized Appellant's long history of alcohol and drug abuse, and agreed that he exhibited borderline intellectual functions. In addition, the experts found several events to have been significant to Appellant's state of mind at the time of Officer Gregg's murder, *i.e.*, Appellant's loss of the custody of his young daughter, his domestic dispute with the child's mother, his drinking of alcohol, and his arrest. In the opinion of the three defense experts, on the day of Officer Gregg's murder, Appellant was acting under the influence of extreme emotional disturbance and was substantially unable to conform his conduct to the requirements of the law, due to some combination of mental illness, intoxication and long-term substance abuse, and recent stressful experiences. N.T., 11/14/06, at 28–29, 128–29; N.T., 11/16/06, at 39–41. Each expert reached these conclusions from his distinct perspective.

Dr. Mack opined that Appellant had sustained mild to moderate brain damage, caused by a series of head injuries and chronic alcohol abuse. N.T., 11/14/06, at 8–11, 17, 23–24. Dr. Mack further opined that Appellant's brain damage had resulted in the loss of an "internal brake" in his brain, which normally functions to inhibit inappropriate responses or inappropriate behavior due to anticipation of negative consequences. N.T., 11/13/06, at 167–68; N.T., 11/14/06, at 18–19. Dr. Mack explained that alcohol consumption exacerbated Appellant's problems: "You add those two [loss of the internal brake and alcohol consumption] together and you get even worse disinhibition, disinhibition of brain functions, but [Appellant's] brain is bad without alcohol. He's missing his brain, to a large extent, regardless of whether he's on mood altering substance, or sedating substances or not." N.T., 11/13/06, at 167–68. In addition, Dr. Mack opined that it was "very likely [that Appellant was] in major depressive disorder at the time of the incident in question, as triggered by the removal of his daughter by Children and Youth Services, a few weeks prior, and severe fighting, dysfunction with his daughter's mother." N.T., 11/14/06, at 20.

Dr. Voskanian opined that, at the time of Officer Gregg's murder, Appellant was suffering from bipolar disorder and from alcohol and cocaine dependence, and in addition was acutely intoxicated. N.T., 11/14/06, at 83. Dr. Voskanian determined that Appellant's bipolar disorder manifested predominantly as depression, and he suggested multiple causes, including his genetic background, his traumatizing upbringing, his substance abuse, and/or his head injuries. *Id.* at 119–20. Finally, in Dr. Voskanian's view, "the entire rampage at the emergency room, it starts after [Appellant] shot himself in the hand and he could see the emergency room through the hole of the gunshot wound through his hand. That's when he completely loses any volition and control over his behavior." [8] *Id.* at 128.

8. Dr. Voskanian's opinion ignores the fact that Appellant's "entire rampage at the emergency room" began when he grabbed for Officer Warunek's gun, disarmed the officer, and immediately began shooting

Dr. Tepper testified regarding Appellant's long history of treatment for drug and alcohol abuse and dependence, beginning in 1992, and then continuing in March 1999, from November 2002 to February 2003, in April 2004, and in February 2005. Finally, on September 20, 2005, just nine days before Officer Gregg's murder, Appellant began drug and alcohol treatment as part of a program to regain custody of his daughter. N.T., 11/16/06, at 16–23. Dr. Tepper also focused on Appellant's poor problem-solving skills. Specifically, he testified as follows: "[w]ell, [Appellant], when he is sober and somewhat stable, he has real modest ability to solve problems. If he's more upset, angry, impulse [sic], high, drugged, those problem solving abilities are going to be diminished even further." *Id.* at 26–27; *see also id.* at 34 ("under times of stress, under times of difficulty, when feeling angry, when getting mad, getting upset, if he's drinking, if he's high or intoxicated, modest problem solving skills he has, are only going to be diminished further. There's also the underlying brain damage so that influences how he interacts and reacts in general and that is going to be aggravated with, if not stress, specifically when he's under the influence of alcohol or drugs."). With regard to Appellant's emotional functioning, Dr. Tepper opined that Appellant's "cumulative history of developmental interferences [from his childhood] . . . really disabled him from later developing a strong kind of sense of himself and ability and confidence." *Id.* at 29. Finally, Dr. Tepper testified that Appellant had difficulty with "impulse control," which rendered him at times unable to control himself. *Id.* at 37–41. On the day of Officer Gregg's murder, Dr. Tepper opined, Appellant was behaving in an "impulsive" way, "meaning that he was making threats, that he was talking about either [sic] hurting individuals. He talked about killing himself. He'd been drinking alcohol." *Id.* at 36.

Thus, as summarized above, the defense experts all concluded that Appellant had difficulty controlling his behavior and

the officers at close range, during which rampage he injured his own hand. There is no evidence of record concerning the size or extent of Appellant's self-inflicted injury to his hand.

his actions. Furthermore, the experts agreed that, on the day of Officer Gregg's murder, Appellant's difficulty with impulse control came to the fore, exacerbated by his consumption of alcohol and recent stressful events in his life.

The Commonwealth did not call its own mental health expert to testify at the penalty proceedings; however, the Commonwealth challenged the defense expert witnesses' testimony with extensive and thorough cross-examination. For example, the Commonwealth clarified that, although Appellant may very well have had some mental health issues, he did not suffer from hallucinations, he was not delusional, and he was not even mildly mentally retarded. N.T., 11/14/06, at 54–56; N.T., 11/16/06, at 65–66. The Commonwealth also emphasized that Appellant's head trauma, postulated by the defense experts as a cause of brain damage, was not supported by any medical record or medical history of head injury. N.T., 11/14/06, at 49–53, 134–35.

Under cross-examination, Dr. Voskanian acknowledged that Appellant's depression did not cause him to lose control of his behavior, such that he could not stop himself from firing the gun and killing Officer Gregg. N.T., 11/14/06, at 130. Rather, Dr. Voskanian explained, Appellant "has no brakes when he is intoxicated." *Id.* at 132. Dr. Voskanian further explained his insights into Appellant's mental status as follows:

*Prosecutor:* Well, [Appellant] was seen at Charter Fairmount [Institute, a drug and alcohol treatment facility, in 1992] and they concluded that he did not suffer from anything other than intermittent explosive disorder and alcohol dependence; is that correct?

*Dr. Voskanian:* Yes, that's their diagnosis.

*Prosecutor:* And they reported that he indicated that his problem was, is that he has a quick temper; is that right?

*Dr. Voskanian:* Yes.

*Prosecutor:* And his problem is that he has a chip on his shoulder?

*Dr. Voskanian:* Yes.

*Prosecutor:* And he always had a chip on his shoulder?

*Dr. Voskanian:* Yes.

*Prosecutor:* And that he is a mean drunk?

*Dr. Voskanian:* Yes.

*Prosecutor:* And he likes to drink because it makes him more fun?

*Dr. Voskanian:* Well, yes.

*Id.* at 146.

*Prosecutor:* . . . you have concluded to a reasonable degree of psychiatric certainty that [Appellant] was under the influence of extreme mental and emotional disturbance. That mental and emotional disturbance was caused by his drinking, correct?

*Dr. Voskanian:* That day.

*Prosecutor:* That day?

*Dr. Voskanian:* I think [Appellant's] poor judgment was caused by his drinking. And his extreme emotional disturbance was caused by the gunshot wound to the hand. In combination with everything else, the chronic stressors and, of course, his intoxicated state and multiple social issues. Losing custody [of his young daughter]. Being arrested right after the incident of domestic violence in the car. The whole picture is very stressful.

*Id.* at 151–52.

Under cross-examination, Dr. Tepper testified that "what actually did set [Appellant] off" just prior to the murder was not clear. N.T., 11/16/06, at 44. Dr. Tepper also acknowledged that many of the stresses in Appellant's life were brought on by his own, often criminal, conduct. *Id.* at 58.

In sum, the Commonwealth challenged the defense experts' testimony by pointing out gaps in the evidence, narrowing the reasonable inferences from the testimony, and suggesting alternative possible interpretations. Furthermore, much of the evidence presented during the Commonwealth's case-in-chief could be considered at odds with the defense expert's portrayal of Appellant as incapable of controlling his behavior and actions on the day of Officer Gregg's murder. Several

witnesses testified that, when Appellant was first brought into the emergency room by Officers Gregg and Warunek, he was cooperative and communicative with the officers and the hospital staff. There was no indication that the situation was going to take a threatening and violent turn until Appellant came out of the lavatory, when he suddenly and successfully disarmed an experienced police officer. Appellant then immediately shot and wounded both officers and Mr. Epp. When Mr. Epp attempted to restrain Appellant, Appellant kicked himself free of Mr. Epp's grip, and said that he would be back for Mr. Epp later. N.T., 11/8/06, at 23. Appellant then deliberately and sequentially walked over to each officer lying on the floor, firing two bullets at close range into Officer Gregg's head and being stymied in his attempt to shoot Officer Warunek again only because by that time the gun was empty. While Appellant was shooting or attempting to shoot the officers, he said words that made it clear that he was well-aware of what he was doing, to wit, "die, pig, die" and "F–you, pig." N.T., 11/6/06, at 219; 11/8/06, at 23; 11/9/06, at 25. Appellant did return to Mr. Epp, as he said he would, aimed the gun at him, and pulled the trigger, but by this time the gun was empty. N.T., 11/8/06, at 25. Appellant then ran from the emergency room, wrapped the injury on his hand, and hid in a car parked in the hospital parking facility. After Appellant was re-apprehended, he continued to threaten law enforcement officers and medical personnel during treatment for his injury, made clear that he knew what he had done, and expressed regret that he had not killed more officers. The jury could very well have concluded that the defense experts' opinions were simply incompatible with all this evidence of deliberate, pre-meditated, directed, controlled, and ordered actions by Appellant during his violent shooting spree in the emergency room.

The trial judge properly instructed the jury to consider all of the evidence presented during the proceeding, and to consider the arguments proffered by the Commonwealth and by Appellant. N.T., 11/17/06, at 32 (jury instructions). The jury is presumed to have followed the court's

instructions. *Williams*, 854 A.2d at 447. Appellant has offered no evidence to the contrary, only his disagreement with the jury's finding of no mitigating circumstances. Appellant's contentions that the evidence of mitigation was unrebutted and that the jury improperly ignored the unrebutted evidence are belied by the record, as shown by our extensive summary of the evidence, *supra*. The jury did not accept the defense expert's opinions, but instead, after considering the testimony of numerous witnesses at the scene of the murder as to Appellant's actions on the night of the crime and Appellant's later admissions, "concluded that [A]ppellant's mental state was not such as would qualify as a mitigating circumstance." *See Henry, supra* at 939. In making this assessment, the jury acted well within its prerogative. *See Walter, supra* at 568; *Treiber, supra* at 30–31. Based on our careful review of the record, we conclude that the trial court did not abuse its discretion in denying Appellant's challenge to the weight accorded his mitigation evidence and accordingly denying his motion for a new trial.[9]

9. Appellant makes several other arguments under issues six and seven that are also lacking in merit.

He insists that because the Commonwealth conceded his diagnosis of depression, the diagnosis was equivalent to a stipulation, and hence the jury erred by not finding Appellant's depression to be a mitigating circumstance. Appellant's Brief at 40–41. To support this contention, Appellant cites the following statement which the Commonwealth made regarding Appellant's depressed state at closing argument:

One [defense expert witness] said depression. No kidding. Because the other [defense expert witness] admits, of course, [that Appellant is] going to be depressed. He's in prison. Looking at a life or death sentence. Of course, he's depressed. He's not free. He can't drink or do whatever else he wants to do. He's depressed. Absolutely. The Commonwealth concedes that.

N.T., 11/16/05, at 85 (closing argument).

It is clear from the Commonwealth's statement that the Commonwealth conceded the fact that Appellant was depressed. However, the Commonwealth did **not** concede that Appellant's depressed state constituted a mitigation factor. Appellant has improperly conflated two distinct facts and two very different concessions.

For his argument to the contrary, Appellant relies on *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069, 1089 (2001), another direct capital appeal, in which this Court considered the implications of a stipulation that the defendant had no significant history of prior criminal convictions. Pursuant to 42 Pa.C.S. § 9711(e)(1), "mitigating circumstances **shall** include the following: (1)[t]he defendant has no significant history

## Passion, Prejudice, or other Arbitrary Factor

In Appellant's eighth issue, he contends that his sentence of death was the result of passion, prejudice, or other arbitrary factor and must therefore be vacated. Appellant suggests that the following specific occurrences at trial support his general claim of the influence of passion or prejudice or other arbitrary factor: (1) allegedly improper victim impact testimony; (2) allegedly improper statements in the Commonwealth's closing argument; (3) religious references by the prosecutor during the closing argument; (4) alleged juror misconduct; (5) testimony of Trooper Carcaci speculating that Appellant was

of prior criminal convictions." *Rizzuto, supra* (quoting 42 Pa.C.S. § 9711(e)(1) (emphasis added)). Accordingly, we concluded that "where the absence of a prior record is not in dispute, ... the sentencing jury has no discretion whether or not to find the existence of this fact as a mitigating factor." *Id.*

In contrast to "no significant history of prior criminal convictions," depression is not an expressly specified mitigating circumstance. Appellant cites no authority for his inference that depression should be considered a mitigating circumstance *per se,* and we decline to set forth any such rule. We also note defense expert Dr. Voskanian's acknowledgment that Appellant's depression did not cause him to lose control of his behavior, such that he could not stop himself from firing the gun and killing Officer Gregg. N.T., 11/14/06, at 130. There is absolutely no merit to Appellant's contention that the jury acted in an arbitrary and capricious manner by declining to find that the stipulated fact of Appellant's depressed state constituted a mitigating factor.

Appellant advances a similar argument with regard to his guilty plea to first-degree murder, which, in Appellant's view, "is clearly a mitigating factor to be considered by the sentencer." Appellant's Brief at 40. Appellant provides no citation for this assertion, and we decline to promulgate such a rule. Whether a defendant's guilty plea constitutes a mitigating circumstance is a finding of fact, appropriately left to the jury.

Finally, Appellant cites *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), as authority for "the United States Supreme Court's assumption that a finder of fact would find mitigating circumstances as it is required by law to do, in a case where substantial, often uncontested evidence of mitigation is presented. The United States Supreme Court [in *Parker* ] held that the trial court found mitigation because under the facts of that case, it would have been required by the law to do so." Appellant's Brief at 43. Appellant has misinterpreted and misstated *Parker's* holding, which, contrary to Appellant's inference, did not circumscribe—or even consider—the jury's responsibility to assess credibility of the witnesses and weigh the evidence presented as to mitigation. The holding in *Parker* does not address the question as

going to kill his girlfriend; (6) allegedly improper testimony of Ms. Kairis, Appellant's then-girlfriend.

If, based on the trial record, this Court determines that a sentence of death was the product of passion, prejudice, or any other arbitrary factor, we must vacate the sentence. *Commonwealth v. Reyes*, 600 Pa. 45, 963 A.2d 436, 441 (2009) (citing 42 Pa.C.S. 9711(h)(3)). We address each of Appellant's assertions of passion, prejudice, or arbitrariness in turn.

Appellant first asserts that the victim impact testimony presented at his penalty hearing was improper. The United States Supreme Court has held that the Eighth Amendment to the United States Constitution does not present a bar to the admission of victim impact evidence. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). As the Court explained, victim impact evidence is "designed to show [ ] each victim's uniqueness as a human being." *Id.* at 823, 111 S.Ct. 2597 (citation omitted); *see also Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143, 150 (2001) (Opinion Announcing the Judgment of the Court) (discussing *Payne* in the context of capital sentencing, where victim impact testimony "conveys to the jury that the decedent was a unique individual whose loss affects society"). As such, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Payne, supra* at 825, 111 S.Ct. 2597. Under *Payne*, a state may determine that a jury should have the opportunity to consider the evidence of specific harm encompassed by victim impact testimony in order to assess fully the defendant's moral culpability and blameworthiness. *Id.*

In 1995, our General Assembly amended the Sentencing Code to allow the admission of victim impact evidence in the penalty phase of a capital trial:

In the sentencing hearing, **evidence concerning the victim and the impact that the death of the victim has had on**

to when evidence of mitigation is sufficient or given proper weight. Contrary to Appellant's contentions, *Parker* affords him no relief.

**the family of the victim is admissible.** Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed. **Evidence shall include matters relating to** any of the aggravating or mitigating circumstances specified in subsections (d) and (e), and **information concerning the victim and the impact that the death of the victim had on the family of the victim** . . . .

42 Pa.C.S. § 9711(a)(2) (emphasis added).[10]

■■■ In *Means*, this Court upheld the constitutionality of Section 9711(a)(2) against challenges based on the United States and Pennsylvania Constitutions. We also determined that victim impact testimony would be admissible only when "the Commonwealth establishes that the victim's death did in fact have an impact on the victim's family." *Means, supra* at 158; *see Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 93 (2008) (reiterating the test of *Means* ); *Williams*, 854 A.2d at 446 (same, citing *Means* ). Once the Commonwealth has met this threshold, the trial court has discretion over the testimony admitted under Section 9711(a)(2). *Baumhammers, supra; Williams, supra; Means, supra.* "Testimony that is a personal account describing the devastating impact the murders had on the surviving families is wholly appropriate and ° admissible at the sentencing phase of a capital case." *Baumhammers, supra* at 93 (internal quotation marks and citation omitted); *see also Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1023 (2007) (affirming, under Section 9711(a)(2), a trial court's admission of victim impact testimony by the decedent's brother because it had been "offered to impress upon the jury the human effects of [the a]ppellant's crimes").

Absent an abuse of discretion, this Court will not disturb a trial court's admission of testimony under Section 9711(a)(2). *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1140 (2007). An abuse of discretion "exists where the court has reached a conclusion which overrides or misapplies the law, or

**10.** As amended, 1995, October 11, P.L. 1064, No. 22 (Special Session No. 1).

where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.*

Although the evidence that is the subject of Section 9711(a)(2) has been generally labeled "victim impact" evidence, it is important to note that the text of the statute explicitly refers twice to two types of evidence or information: "concerning [1] the victim **and** [2] the impact that the death of the victim has had on the family of the victim." (emphasis added). In *Commonwealth v. Singley*, 582 Pa. 5, 868 A.2d 403 (2005), this Court affirmed the trial court's admission of a victim impact statement that included information as to the good qualities of the victim, particularly as they related to his job. Specifically, the victim's fiancée testified that the victim's employer had shut down its plant for some days following the victim's death, and then had asked her to participate in an award ceremony that was to recognize the characteristics exemplified by the victim. *Id.* at 415. In affirming the admissibility of this testimony, we recognized that the information was not relayed in a vacuum, but rather was presented in the context of the fiancée's involvement in the award ceremony and her family relationships after the victim's death. *Id.*[11]

▆▆▆▆ Here, Appellant takes issue with the victim impact testimony of several individuals, starting with Officer Gregg's brother, John Gregg, Jr., who, on behalf of his family, read into the record a statement, a copy of which had been previously provided to defense counsel. N.T., 11/10/06, at 158, 160. Mr. Gregg read his statement, *see id.* at 160–63, and then, at the end of his testimony, stated that he was going to deviate

11. In *Commonwealth v. Natividad*, 565 Pa. 348, 773 A.2d 167 (2001), we affirmed the admissibility of victim impact testimony from the victim's widow. She testified as to the victim's military service, honorable discharge, 24–year career as an ironworker, subsequent work as a security guard, and community involvement. *Id.* at 179. She also testified that her late husband was a loving husband, father, grandfather, and son, who came to the aid of anyone who needed help, and who loved and respected life. *Id.* The appellant in *Natividad* did not challenge the content of the victim impact statement, but rather focused on the allegedly late notification he had received concerning the prosecution's intent to call the victim's widow. *Id.*

from the written statement to demonstrate how the outpouring and sorrow of the community had been a source of comfort for his family. Appellant challenges **only** the following portion of Mr. Gregg's testimony, which constituted his spontaneous deviation in its entirety:

[O]n the day of the funeral, as the procession went through town from the church building to the cemetery, the number of people in the community that stood along the streets was unbelievable. It was as if there was a parade taking place, except, so many people were crying in the town.

In the day when too often what we hear in the news is bad, it's good to be reminded that there are men and women like Brian who served well, and they are a credit to the uniform which they wear.

Brian was the kind of man who was an asset to any home, family, community or people. He is missed and his loss will be felt by us all.

*Id.* at 163; *see* Appellant's Brief at 74.

Appellant asserts that Mr. Gregg's deviation from his prepared statement was improper because it "went beyond the impact Officer Gregg's death had on his family and instead implanted the vision of an entire community weeping and bereft over the officer's death." Appellant's Brief at 74.

Our review of the record reveals that, at trial, Appellant did not object to any portion of Mr. Gregg's testimony. Accordingly, Appellant has waived this issue pursuant to Pennsylvania Rule of Appellate Procedure 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). *See Commonwealth v. May,* 584 Pa. 640, 887 A.2d 750, 761 (2005) (in a direct capital appeal, denying the appellant's challenge to the admission of certain evidence in the penalty phase because defense counsel had not objected to the evidence during the trial); *Commonwealth v. McCrae,* 574 Pa. 594, 832 A.2d 1026, 1037 (2003) (explaining that in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), this Court adopted a new general rule providing that claims not

properly preserved and raised in the trial court are waived and unreviewable in capital direct appeals).

■ Although we deny this claim based on waiver, we must point out that the challenged portion of Mr. Gregg's testimony was merely a few sentences describing how his grieving family was comforted by the knowledge that Officer Gregg had performed his professional duties well and was recognized in the community for his service. The brief statement of Officer Gregg's admirable characteristics was not "improper testimony [that] shifted the focus of the proceeding away from victim impact." Appellant's Brief at 75. Rather, it was testimony that rested well within the parameters explicitly set forth in Section 9711(a)(2). *See Singley, supra* at 415. Appellant fails to mention *Singley,* and indeed provides absolutely no convincing argument that the trial court abused its discretion in admitting Mr. Gregg's testimony in its entirety.

■■ Appellant next challenges the testimony of Anthony Wojciechowski, the chief of the Newtown Borough Police Department, who had hired and supervised Officer Gregg, and the testimony of Mr. Epp, the emergency medical technician whom Appellant shot. N.T., 11/6/06, at 56–59, 61–63, 65, 67; and N.T., 11/8/06, at 15–16, 32. Appellant did not object to any of this testimony at trial, and hence his claims are waved pursuant to Pennsylvania Rule of Appellate Procedure 302.[12]

12. Appellant specifically challenges, as "improper victim impact testimony," *see* Appellant's Brief at 75–76, the following portions of Chief Wojciechowski's testimony, which are excerpted in context:

*Prosecutor:* And how would you describe Officer Gregg as a police officer?
*Chief Wojciechowski:* Excellent police officer. He was loved by both his colleagues and the community, absolutely loved. He was a real asset to the community, and anyone here will tell you that.
*Prosecutor:* And how would you describe Officer Gregg as a person?
*Chief Wojciechowski:* One of the finest human beings I ever met.
N.T., 11/6/06, at 59; *see* Appellant's Brief at 75.
*Prosecutor:* Did you see [Officer Gregg] that day [the day of the shootings]?
*Chief Wojciechowski:* I did. I saw [him] at about 8 o'clock that morning when he came in for court.
*Prosecutor:* And can you describe that contact?

*Chief Wojciechowski:* [Officer Gregg] was in. He went to court. He and I spoke. It was not uncommon for [him] to stop in to my office and we would talk about things that were going on. He was a **very helpful human being.** He was always trying to help me complete something. And he left, I recollect, somewhere around 11:30 or 12 o'clock. He was done court, and the last things I said to him, or he said to me, I'll see you at 3:00, and I never did see him that day because I left at 2:00.

N.T., 11/6/06, at 61 (emphasis applied to portion challenged by Appellant); *see* Appellant's Brief at 75.

*Prosecutor:* Chief, when did you learn that there was a problem at the hospital?

*Chief Wojciechowski:* At around 6:20 to 6:25. I was at home and I had made a phone call on my cell phone, and the phone was laying [sic] on the table, and I was in the shower, and I heard my wife come to just outside the shower door and [she] said to me, take this phone. Now, I cracked [the] door open because I was covered in soap and shampoo, and said to my wife—and when I opened the door, I looked at my wife. **She was the color of my shirt, pure white.**

N.T., 11/6/06, at 62–63 (emphasis applied to portion challenged by Appellant); *see* Appellant's Brief at 75.

In addition, Appellant challenges those portions of Chief Wojciechowski's testimony in which he described delivering the news of Officer Gregg's death to his wife and to Officer Warunek:

*Chief Wojciechowski:* In all the years I've been in law enforcement, I've never had to deal with anything like that.

And Mrs. Gregg opens the door, and I looked at her, and I said, [Officer Gregg's] been shot. And I believe she said, how is he? And I had to tell this woman I don't know, because I did not know.

N.T., 11/6/06, at 65; *see* Appellant's Brief at 75.

*Prosecutor:* Did you—were you able to see Officer Warunek at some point?

*Chief Wojciechowski:* At some point that night after a briefing and a press conference I asked Dr. Blackstone, my officers indicated to me that Officer Warunek was not aware that [Officer Gregg] was dead, and I asked Dr. Blackstone if it was okay for me to go tell him. And he said, you have to. In his head and in his heart he knows, but you have to go tell him.

Well, fortunately or unfortunately for me, as I was getting to where [Officer Warnuek] was being treated, apparently, [he] saw it on the news, and I went in and it was just him and I. I remember leaning over and kind of hugging him. I really wasn't sure what the nature of his injuries were. I remember holding his head, and we talked, and all he kept saying was, why not me? And we talked about [Officer Gregg] briefly, and I said [he] died doing what he loved and we have to let that be.

N.T., 11/6/06, at 67; *see* Appellant's Brief at 75.

Appellant also specifically challenges, as "improper victim impact testimony," the following portions of Mr. Epp's testimony, which are excerpted in context:

*Prosecutor:* Is it also correct to say that [the medication for pain caused by the shooting injuries] does not affect your ability to recall the events of September 29th, 2005?

■■ Finally, Appellant challenges, as "improper victim impact testimony," the testimony of two witnesses who had been at the scene of the shootings: Kimberly Fetteroff, a nurse who briefly described comforting a very fearful young patient in the emergency room after the shootings, N.T., 11/9/06, at 52; and Barbara Townsend, whose child was in the emergency room for treatment when the shootings occurred and who testified that she hugged a woman who was cleaning up blood drops on the floor after the shootings because she

> *Mr. Epp:* I've been, unfortunately, every night I have some sort of nightmare. I wake up screaming and crying and—
> *Prosecutor:* Joe, I understand. You can only answer the question that I ask.
> *Mr. Epp:* Okay.
> N.T., 11/8/06, at 16; *see* Appellant's Brief at 75–76.
> *Prosecutor:* Mr. Epp, when you first saw Officer Gregg and Officer Warunek [on the day of the shooting], can you describe their demeanor for the jury?
> *Mr. Epp:* When they were walking in from triage they were calm. Everybody was calm. All three were calm. No one was violent, or outraged, or had shown any kind of anger.
> *Prosecutor:* And during your conversation with Officer Gregg while Officer Warunek and [Appellant] were in the bathroom, what was his demeanor during that conversation?
> *Mr. Epp:* Officer Gregg was always, **always smiling.** I mean, he was **always in a great mood.** Even if I was having a really bad day and he had come in, he would always—he **always made everybody feel like they're having the best day of their life,** and that was repeatedly over [sic]. I mean, I've never seen him in any other way other than happy.
> *Prosecutor:* Was that what he was like that night?
> *Mr. Epp:* I'm sorry?
> *Prosecutor:* Was that what he was like that night?
> *Mr. Epp:* Yes.
> N.T., 11/8/06, at 32 (emphasis applied to portion cited by Appellant); *see* Appellant's Brief at 76.
> Although, as discussed in the text, *supra*, Appellant's challenges to this testimony are waived, we must note that even if the issue were not waived, we would not grant Appellant any relief. The challenged testimony describes Chief Wojciechowski's and Mr. Epp's actions prior to and shortly after the shootings, including their interactions with Officer Gregg and their relationship with him. Included in the testimony are some brief references to Officer Gregg's good qualities as a police officer and a person. We would not conclude that such brief testimony, in the context of a penalty phase hearing of nearly two weeks' duration and involving more than forty witnesses, so inflamed the passions and prejudice of the jury that the verdict should be discarded.

"ached" for the woman and "ached for anybody who might have seen what had taken place." N.T., 11/8/06, at 128. *See* Appellant's Brief at 76. Appellant did not object to any of this testimony at trial, and hence his claims are waved pursuant to Pennsylvania Rule of Appellate Procedure 302.[13]

In Appellant's next allegation of passion and prejudice directing the jury's verdict, he cites several comments made by the prosecutor in her closing argument. Specifically, Appellant contends that the prosecutor "improperly minimized the jury's sense of responsibility for its verdict" and "mocked Appellant's mitigation case by pretending to speak for him." Appellant's Brief at 76–77.[14] There is no indication from the record that Appellant objected to the prosecutor's closing argument during the proceedings, and hence these issues are waived pursuant to Pennsylvania Rule of Appellate Procedure 302(a). *See McCrae*, 832 A.2d at 1037 (in the context of a challenge to the prosecutor's closing argument, stating that failure to raise the issue before the trial court would render the issue waived pursuant to Rule 302).

Next, Appellant cites several other portions of the prosecutor's closing argument, which, he contends, included

13. We also must point out that the testimony of Ms. Fetteroff and Ms. Townsend is not **improper** victim impact testimony—it is not victim impact testimony at all. The challenged testimony concerns neither the victim, nor the impact that the death of the victim has had on his family. *See* 42 Pa.C.S. § 9711(a)(2).

14. Appellant takes issue with the following specific comments by the prosecutor:

> You do not—do not hold the power of life and death in your hands. You do not. The law decides when that sentence is to be imposed. The law sets the factors out. You cannot and will not come back into this courtroom and decide the issue of life and death.

N.T., 11/16/06, at 79 (Prosecutor's Closing Argument); *see* Appellant's Brief at 76.

> I want you to take my criminal conduct and then use that to justify my murderous conduct in the hospital. Use that to lessen how serious and horrible it was. Use that to mitigate it. I'm a drug addict. I violated the law every day since I was 12 years old.

N.T., 11/16/06, at 88; *see* Appellant's Brief at 77–78.

> That list of [Appellant's] victims doesn't include everybody in Newtown Borough[ ] that became close to him.

N.T., 11/16/06, at 82; *see* Appellant's Brief at 78.

religious references.[15] In addition, Appellant cites testimony by two witnesses that they prayed at the scene after the shootings were over and by an emergency room technician that he administered "last rites" to Officer Gregg at the scene. *See* Appellant's Brief at 79. As discussed immediately above, these issues are also waived pursuant to Pennsylvania Rule of Appellate Procedure 302(a). *See McCrae,* 832 A.2d at 1037.

 Appellant next contends that the misconduct of several members of the jury following the completion of sentencing revealed that the jury was "anything but fair and impartial." Appellant's Brief at 81. Following the jury verdict and the court's imposition of the death penalty, the court thanked and excused the jury. However, the court also invited the jury to return to the courtroom for the afternoon session, at which time the court imposed sentence on Appellant's remaining, non-capital counts. Appellant alleges that after the completion of sentencing, one of the jurors yelled "How do you like us now?" to him, and other jurors cheered. This event is not of record, but Appellant has supplied supporting affidavits by two public defenders who represented Appellant and were in the courtroom for sentencing.[16]

**15.** Appellant specifically cites the following as examples of the prosecutor's allegedly improper religious references:

As you get older and you go through life and you realize life can be hell. Life could be tough.

N.T., 11/16/06, at 78; *see* Appellant's Brief at 78.

[Appellant] brought hell to earth on September 29, 2005.

N.T., 11/16/06, at 80; *see* Appellant's Brief at 78.

There was hell in that emergency room and so many people paid the price for it.

N.T., 11/16/06, at 81; *see* Appellant's Brief at 78.

[Appellant] shot Officer Jim Warunek in the chest. It is by the grace of God that he sits here today.

\* \* \*

[Appellant] shot Joseph Epp. It is again by the grace of God that Joseph Epp is alive and with us today.

N.T., 11/16/06, at 97; *see* Appellant's Brief at 78.

[Appellant's] angry and hellbent.

N.T., 11/16/06, at 91; *see* Appellant's Brief at 78–79.

In your deliberations[,] I'd ask you to remember this[:] where [Officer Gregg] is now, they don't need police.

N.T., 11/16/06, at 103; *see* Appellant's Brief at 79.

**16.** The affidavits were signed by Peter Charles Hall, Chief Deputy Public Defender of Bucks County, and C.B. Kirschner, Deputy Public

The right to be judged by a fair and impartial jury of one's peers is, of course, firm and well-established. *Commonwealth v. Jones*, 530 Pa. 591, 610 A.2d 931, 937 (1992). However, the inalterable fact of human frailty requires us to recognize that not every act of juror misconduct warrants the declaration of a mistrial. Only when there has been prejudice to the accused does an act of juror misconduct require the granting of a new trial. *Id.*

Here, the alleged juror misconduct did not occur until after the court had finished sentencing Appellant, which was hours after the jury's deliberations had been completed. The comment of one juror and the cheers of some undetermined number of jurors, **once the jury deliberations and the proceedings were entirely completed,** were inappropriate and may have momentarily disrupted the decorum of the court room. However, they do not demonstrate that the jury's sentence was the product of passion and/or prejudice. Appellant's mere assertion that the comment and cheers were indicative of the unfairness and partiality of the jury finds no support in the record, and this claim accordingly lacks merit.

Next, Appellant contends that the trial court erred in admitting the following testimony of Trooper Carcaci, the off-duty state trooper who initially stopped Appellant's car on the day of Officer Gregg's murder.

*Trooper Carcaci:* I was following [Appellant's] vehicle up Chancellor, and as we were approaching, I think it was Jefferson, there's a ball field right there, and there was a car stopped at the intersection, and [Appellant] had come flying down the street and just slammed the brakes on. He came right up the back of the car. I thought, oh, man, he is going to slam the back of the car. He just stopped in time, I thought, and he was just pummeling her, beating her and pummeling. I thought, well, if this guy gets out of the way, I am going to be able to block him in. I can't wait any longer because he can potentially kill this girl.

Defender, and were dated, respectively, March 5, 2008, and January 18, 2008.

*Defense Counsel:* I'm going to object, Your Honor.

*Court:* We will let it stand. Overruled.

*Trooper Carcaci:* The car—

*Court:* It's not admitted for the truth of the matter asserted, just his mental image. You may continue.

*Trooper Carcaci:* The car then that was stop[p]ed at the stop sign that had held [Appellant] up, that car left its position [at] the stop sign. That's when I drove around right in front of [Appellant] and stopped and got out.

N.T., 11/6/06, at 146–47.

Appellant contends that this testimony had no probative value and was extremely prejudicial and inflammatory because Appellant "was being accused by implication of trying to kill another victim for whom he had only been charged with simple assault." Appellant's Brief at 82.

■■■■ We review a trial court's decision to admit testimonial evidence for abuse of discretion. *Dillon,* 925 A.2d at 141. Evidence of other crimes is admissible when it is relevant to furnish the context or the complete story of the events surrounding a crime. *Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 30–31 (2007); *see also Bernstein, 2007 Pa. Rules of Evidence,* Comment 13a to Pa.R.E. 404 (Gann).

Here, we cannot conclude that the trial court abused its discretion in admitting Trooper Carcaci's testimony. Trooper Carcaci's testimony was probative because it explained why the off-duty state trooper believed it was necessary to stop Appellant's car—an act that initiated the entire sequence of events that resulted in Officer Gregg's murder. We cannot conclude that the trial court abused its discretion by finding Trooper Carcaci's testimony more probative than prejudicial, and hence admitting it.

■■■ Finally, in the last sub-issue of issue eight, Appellant contends that the testimony of Ms. Kairis, Appellant's then-girlfriend, was "replete with hearsay and [with] highly inflammatory and prejudicial information." Appellant's Brief at 82. Specifically, Appellant challenges Ms. Kairis's testimony that

Appellant had physically assaulted her several times over the past three years, and that, on the day of Officer Gregg's murder, Appellant had threatened to kill several individuals and had physically shaken his elderly grandmother. Appellant did not object to Ms. Kairis's testimony at trial, and hence his claims are waived pursuant to Pennsylvania Rule of Appellate Procedure 302.

### Sentence for Recklessly Endangering Another Person

█ In issue nine, Appellant challenges the legality of his sentence for ten counts of recklessly endangering another person ("REAP").[17] For these ten counts, the trial court sentenced Appellant to an aggregate term of imprisonment of not less than twenty nor more than forty years. N.T., 11/17/06, at 75–76.

Appellant contends, and the Commonwealth agrees, that the sentence imposed exceeded the statutory maximum. REAP, as a misdemeanor of the second degree, is subject to a two-year statutory maximum. *See* 18 Pa.C.S. § 2705 (characterizing REAP as a misdemeanor of the second degree) and § 1104 (establishing a maximum imprisonment term of two years for a person convicted of a misdemeanor of the second degree). The trial court exceeded the statutory maximum term of imprisonment for ten counts of REAP when it imposed a sentence of not more than forty years. Hence, we must vacate Appellant's sentence for REAP, and remand to the trial court for re-sentencing.

### Recusal

In issue ten, Appellant contends that the trial judge erred by not recusing himself from deciding post-sentence motions in light of his allegedly "biased" comments before and after sentencing. Appellant's Brief at 86. Appellant suggests that the following four short excerpts demonstrate the trial judge's bias.

First, Appellant cites the judge's closing remarks after Appellant's competency hearing in October 2006, in which the

17. 18 Pa.C.S. § 2705.

judge refuted the notion that a defendant who proclaims that he wishes to die must be incompetent.

> Now, I think the defense would have us accept [that,] as a bright line test, a statement of a defendant that he wishes to die must, therefore, indicate that he is incompetent, and nothing could be further from the truth. Given the circumstances and the theory known only to [Appellant], that may be the most rational response. That's all.

N.T., 10/13/06, at 154–55.

Second, Appellant cites the judge's comments to the jury as to the appropriateness of the verdict, which comments were made after the judge imposed the death sentence and after he thanked the jury members for their service.

> It is my practice not to comment upon a verdict rendered. The jury speaks and I accept it. But I will say to you, as a whole, and to each and every one of you, that this verdict is certainly, without any doubt, supported strongly by the evidence you've heard. There is great support in the record for that decision. I want you to know that.
>
> I sat here as well as you did, and it is an appropriate verdict. It is a just verdict. And it is the right verdict, in my view, under the facts and the law.

N.T., 11/17/06, at 64.

Third, Appellant cites the judge's comments at sentencing regarding the victim impact statement read by Officer Gregg's brother, in which comments the judge suggested that he would have understood a cry for vengeance.

> I heard the victim impact statement from John Gregg, speaking on behalf of his family. I was taken with the fact that he was so composed, and I was grateful for the fact that although we would understand a cry for vengeance, he did not ask for that, although, certainly that might have been an appropriate response. Instead he tried to share with us the measure of [Officer] Gregg.

N.T., 11/17/06, at 72–73.

Fourth, Appellant cites the judge's comments to Appellant after the judge completed the imposition of sentence.

We stand for something here in Bucks County.

Now, Mr. Flor, there are certain indelible memories in my mind from this hearing. I was stunned with your statements after the shootings. Cruel. Cold. Heartless. But one statement will stick in my mind as long as I live. And that statement was: "The punk got what he deserved." Mr. Flor, I want to remind you of an old Biblical prophecy from the book of Exodus, and it states: "The words you use to condemn will in the end condemn you." And I am sure that, perhaps hundreds of thousands of people, when they read or hear this sentence, will use your words and say, **"that punk got what he deserved."** That's all.

N.T., 11/17/06, at 77–78 (emphasis added by Appellant, *see* Appellant's Brief at 86).[18]

 The standards applicable to a motion to recuse are well-established.

It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without

18. Appellant also implies that the trial judge exhibited bias by declining to vacate his Pennsylvania Rule of Appellate Procedure 1925(b) order until after full trial transcripts were received. Appellant's Brief at 87. Instead, the trial court suggested that Appellant file an amended statement upon his receipt of full transcripts. *Id.* Contrary to the implication in Appellant's brief, Appellant did indeed file an amended Rule 1925(b) statement on January 18, 2008. It is not clear what, if anything, Appellant is arguing in this portion of issue ten.

prejudice, that decision will not be overruled on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

*Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998) (internal citations omitted).

Based on our thorough review of the entire record in the instant case, we conclude that Appellant's allegations of judicial bias do not come close to meeting the above standard. Over the course of lengthy proceedings in which numerous witnesses gave testimony as to violent and emotionally-charged events, the judge maintained decorum in the courtroom appropriate to the gravity and import of the jury's ultimate determination.

None of the four short passages excerpted by Appellant from the lengthy proceedings constitutes evidence of judicial bias. It is not improper for a trial judge to tell a jury, **after** the jury has rendered its verdict, that, in the judge's opinion, such verdict was correct and was strongly supported by the evidence of record.[19] Likewise, it is not improper for a judge to address a defendant after sentencing for the purpose of reiterating to the defendant that the punishment just imposed was well-deserved. In this case, the trial judge chose to use Appellant's own words, as revealed during his trial, to make that point. Such choice of words does not show that the judge was biased against Appellant.

Regarding the victim impact statement by Mr. Gregg, the judge's statement that he would have understood a call for

19. It is entirely improper for a judge to express an opinion as to a defendant's guilt or innocence in the charge to the jury, *i.e.,* **prior to** the announcement of the jury's verdict. *See Commonwealth v. Whitfield,* 474 Pa. 27, 376 A.2d 617 (1977); *Commonwealth v. Archambault,* 448 Pa. 90, 290 A.2d 72 (1972). The rationale behind this principle is that the judge's expression of opinion leaves an indelible imprint on the minds of the jury and thereby invades the province of the jury to return a verdict. *Whitfield, supra* at 621; *Archambault, supra* at 73–75. In the instant case, the judge did not state his opinion until after the jury had rendered its verdict and after the judge had imposed sentence, so the concerns expressed in *Whitfield* and *Archambault* are not present.

vengeance—by the murdered officer's brother—does not suggest or imply that the court was in any sense motivated by vengeance or bias. In fact, the judge's statement also made clear that he was grateful for Mr. Gregg's composed demeanor and emphasis on the person of his brother. That the judge would have been able to understand a brother's call for vengeance—had it occurred—against the admitted perpetrator of a police officer's violent murder shows only that the judge had a grasp of human nature, not that he was biased and not that he in any way acted on a non-existent call for vengeance.

Appellant's allegations of bias on the part of the trial judge are entirely without merit, and accordingly he is entitled to no relief on his tenth issue.

## Lethal Injection

In Appellant's eleventh and final issue, he contends that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. For his argument, Appellant relies entirely on the United States Supreme Court's grant of certiorari in *Baze v. Rees,* 551 U.S. 1192, 128 S.Ct. 34, 168 L.Ed.2d 809 (U.S. 2007), where the question presented was whether the lethal injection protocol, as administered in Kentucky, violates the Eighth Amendment. Appellant seeks a stay of execution pending the United States Supreme Court's decision in *Baze. See* Appellant's Brief at 90.

Although *Baze* had not been decided when Appellant filed his brief, the United States Supreme Court did decide the case on April 16, 2008, well before argument here. In *Baze,* the Court held that Kentucky's three-drug protocol of lethal injection was not cruel and unusual punishment under the Eighth Amendment. *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); *see Baumhammers,* 960 A.2d at 96 n. 29. Hence, Appellant's entire argument for a stay of execution has been negated by the decision of the United States Supreme Court.

## Conclusion

Finally, having concluded that Appellant is entitled to no relief on his claims, except with regard to the sentence imposed for the ten counts of REAP, we must affirm Appellant's sentence of death unless we conclude either that it was a product of passion, prejudice, or any other arbitrary factor, or that the evidence failed to support the finding of at least one aggravating circumstance. 42 Pa.C.S. § 9711(h)(3). Having carefully reviewed the record, we are persuaded that Appellant's sentence of death was not the result of passion, prejudice, or any other arbitrary factor, but rather was grounded in the voluminous evidence properly presented in a lengthy penalty phase hearing. We also conclude that the evidence was sufficient to support each of the four aggravating factors found by the jury. Specifically, the victim was a peace officer; Appellant committed the murder during the perpetration of a felony; Appellant knowingly created a grave risk of death to others in addition to the victim; and Appellant had a significant history of prior violent felonies. 42 Pa.C.S. § 9711(d)(1), (6), (7), and (9).

For the foregoing reasons, we affirm the sentence of death, and we remand for resentencing on the ten counts of REAP.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER and TODD join the opinion.