J-A11030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| BRANDON LEE WOLOWSKI | : | |
| | : | |
| Appellant | : | No. 940 WDA 2019 |

Appeal from the Judgment of Sentence Entered May 23, 2019
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0000151-2013

BEFORE: McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY KING, J.: **FILED: JULY 27, 2021**

Appellant, Brandon Lee Wolowski, appeals from the judgment of sentence entered in the Washington County Court of Common Pleas, following his jury trial convictions for one count each of first-degree murder, attempted criminal homicide, and aggravated assault, and two counts of robbery.[1] We affirm.

The relevant facts and procedural history of this case are as follows:

**Factual History**

On January 8, 2013, Michelle Powell went to the grocery store with a friend. Subsequently, Ms. Powell returned home to 905 Fayette Street in the City of Washington, Washington County, where she resided with her boyfriend, Matthew Mathias. [Appellant], who lived nearby, came over to visit Ms. Powell and Mr. Mathias. The three of them talked

---

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 2702(a)(1), and 3701(a)(1)(i), respectively.

for a little while before [Appellant] offered to get Ms. Powell and Mr. Mathias some crack cocaine to smoke. [Appellant] left for approximately twenty minutes before returning with the drugs. [Appellant] gave Ms. Powell and Mr. Mathias the crack which they smoked in the kitchen. While they were smoking, [Appellant] drew a handgun and pointed it at Ms. Powell's face. [Appellant] indicated that he wanted Mr. Mathias's guns. At first, Ms. Powell and Mr. Mathias believed it to be a joke, but [Appellant] stated, "This is not a fucking joke, I want the guns."

[Appellant] told them to get him the guns and told Ms. Powell to flip the lights on and off. [Appellant] then pointed the gun back at Ms. Powell's face and told Mr. Mathias to get the guns. Mr. Mathias then ran out of the kitchen and down the hallway at which point he entered the computer room. [Appellant] ran after Mr. Mathias and Mr. Mathias left the computer room and ran out the front door. Ms. Powell observed [Appellant] shooting at Mr. Mathias as he was running down the hallway and out the front door. Ms. Powell ran to the front door in an attempt to lock it shut, but the dead bolt was open. As Ms. Powell attempted to lock the front door, [Appellant] pushed his way back inside the home. While Ms. Powell was hiding behind the front door, [Appellant] was shooting at her. Ms. Powell attempted to use the front door to shield herself, but [Appellant] pulled the door back and shot her in the face. As Ms. Powell begged him to stop, [Appellant] told her that he was going to kill her.

[Appellant] then fled from the scene and Ms. Powell ran out the front door and across the street seeking help. She was bleeding profusely from her face due to the gunshot wound. Across the street, Ms. Powell encountered the neighbor[, John Lytle,] and asked him to call 911. [Mr. Lytle] then took Ms. Powell into his home, located at 916 Fayette Street, Washington. Sergeant Carl Martin of the City of Washington Police Department received a report of shots fired and a person injured in the West End of the city. At 916 Fayette Street, Sergeant Martin found Ms. Powell who was suffering from an apparent gunshot wound to the side of her face as well as her wrist/hand area. Ms. Powell gave Sergeant Martin a general description of the shooter and indicated that his name was Brandon. Ms. Powell indicated that she

could not remember his last name, but it was a funny last name or a street last name. Ms. Powell described the shooter as a white male with dark hair.

After spending approximately three to five minutes with Ms. Powell, Sergeant Martin proceeded to Addison Street after having been informed that [Appellant] had gone into the rear apartment at 808 Addison Street. Sergeant Martin and his fellow officers approached the door to the apartment, knocked on the door and asked for Brandon to open the door. When the door was finally opened, police found [Appellant] and two other individuals in the apartment. [Appellant] was kept at the apartment for approximately 45 minutes prior to being transported to the police station where he was interviewed by detectives. During this time, [Appellant] was asking questions about the investigation and was "Mirandized"[2] at which time he acknowledged that he understood his rights.

Sergeant Chris Luppino of the City of Washington Police received a call at 7:30 P.M. that there was a deceased victim, Mr. Mathias, on scene and that Ms. Powell was being taken by ambulance to Washington Hospital. Sergeant Luppino left his residence and went directly to the emergency room at Washington Hospital. Upon arriving at the hospital, Sergeant Luppino observed gunshot wounds to Ms. Powell's face, chest, and arm. Ms. Powell told Sergeant Luppino that she was shot by an individual named Brandon, who she described as having dark hair, skinny, and approximately 19-years-old. Ms. Powell informed Sergeant Luppino that [Appellant] had come to Mr. Mathias's home to rob him of his guns. She further related that [Appellant]'s mother's name was Bee McMasters and his girlfriend, Candy, just had a baby.

Lieutenant Daniel Stanek of the City of Washington Police, the lead investigator, was called to duty around 7:30 P.M. on January 8, 2013. Lieutenant Stanek first went to the police station before proceeding to the scene of the crime, 905 Fayette Street. After being briefed at 905 Fayette Street, and at 808 Addison Street, where [Appellant] was

_____

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

arrested, Lieutenant Stanek proceeded to the city police station where [Appellant] had been detained. Prior to interviewing [Appellant], [Appellant] was again "Mirandized," acknowledged his understanding of his rights and agreed to give a recorded statement. [Appellant] then confessed that he had been at 905 Fayette Street that night and that he had shot both Mr. Mathias and Ms. Powell. [Appellant] confessed that he had went to the residence to rob Mr. Mathias of his firearms which he planned to sell to obtain money. [Appellant] went on to confess that he had been planning to commit the robbery for several days and that he believed he might have to shoot both victims.

**Procedural History**

On February 11, 2013, the Washington County District Attorney's Office filed a criminal information charging [Appellant with criminal homicide, attempt to commit criminal homicide, aggravated assault, and 2 counts of robbery].

On February 13, 2013, Glenn Alterio, Esquire of the Washington County Public Defender's Officer entered his appearance on behalf of [Appellant]. On February 19, 2013, the District Attorney's Office filed notice of aggravating circumstances, notifying [Appellant] of the Commonwealth's intention to seek the death penalty. …

On August 2, 2013, [Appellant] filed a handwritten petition asking for Attorney Alterio and the Public Defender's Officer to withdraw and for the trial court to appoint new counsel. On September 4, 2013, [Appellant] filed a *pro se* petition for *habeas corpus*. On September 26, 2013, [Appellant] again acting *pro se*, filed an amended petition to have the Public Defender withdraw and to have the trial court appoint counsel. On October 8, 2013, [Appellant] filed an amended petition for *habeas corpus* as well as a motion to suppress evidence.

On October 15, 2013, Attorney Alterio presented a petition to withdraw his appearance and that of the Public Defender's Office and the trial court scheduled a hearing for October 31, 2013 on the matter. During that hearing, the trial court indicated it would take [Appellant]'s petition under

advisement as the court had to consider the limited number of death penalty qualified attorneys available. Attorney Alterio continued his representation and, on February 20, 2014, presented a petition to retain an expert witness. Additionally, Attorney Alterio presented a petition seeking release of [Appellant]'s records from the Juvenile Probation Department of Washington County and the Child & Youth Social Service Agency of Washington County.

The court authorized the payment and retention of a psychiatrist or psychologist for the defense and ordered Washington County Juvenile Probation to release records of any mental health treatment, or any other treatment, pertaining to [Appellant] while under their supervision. The trial court further ordered that it would conduct an *in camera* review of [Appellant]'s Child and Youth Service files to determine whether the files contained any relevant mitigation information. On April 29, 2014, the trial court additionally granted [Appellant]'s request for new counsel and permitted the Public Defender's Officer to withdraw so that Noah Geary, Esquire, who was death penalty qualified at the time, could enter his appearance.

During a status conference held September 5, 2014, the trial court granted defense counsel's request for a continuance to secure the services of a psychiatrist or psychologist as well as to review the *pro se* petition for *habeas corpus* and motion for suppression filed by [Appellant]. On April 15, 2015, the trial court, at the request of the defense, ordered [Appellant] be transported to Torrance State Hospital for up to ninety (90) days to have his mental health evaluated.

Following the suppression hearing conducted on November 8, 2016, per agreement of the Commonwealth and the defense, the trial court agreed to conduct an *in camera* review of [Appellant]'s recorded confession and the preliminary hearing transcript. On February 17, 2017, the trial court entered an order denying [Appellant]'s petition for *habeas corpus* as well as the motion to suppress. On April 18, 2017, the trial court entered a case management order setting jury selection to begin August 7, 2017, and the jury trial to begin August 21, 2017.

At the status conference conducted August 1, 2017, Attorney Geary, for the first time, requested that co-counsel be appointed in accordance with the American Bar Association Guidelines. At that time, and leading up to that point, defense counsel had represented that [Appellant] would most likely accept the Commonwealth's plea offer to avoid the death penalty and a mandatory life sentence without parole. Defense counsel represented that co-counsel was necessary as a precaution to counsel [Appellant] regarding the plea offer. The defense then asked the trial court to re-schedule jury selection and trial. …[T]he court, on August 22, 2017, entered an order appointing Jeremy Davis, Esquire as co-counsel, who was death qualified. Although Attorney Geary claimed he could work with Attorney Davis, he ultimately refused to do so due to Davis' distant familial relation with a retired Fayette County judge, against whom Attorney Geary had filed a lawsuit. In this regard, on September 12, 2017, Attorney Geary presented a motion for re-consideration of appointment of co-counsel. On September 18, 2017, per Attorney Geary's request, the trial court vacated Attorney Davis's appointment and appointed Thomas Farrell, Esquire as co-counsel. On October 16, 2017, the trial court entered a case management order setting jury selection to begin April 23, 2018 and the trial to begin May 21, 2018. On December 4, 2017, Attorney Geary filed a petition for recusal, which the trial court denied. On December 19, 2017, the trial court denied [Appellant]'s request to amend the order denying recusal so that he could seek an interlocutory appeal.

On March 8, 2018, upon consideration of [Appellant]'s application for a stay of the proceedings, the trial court ordered that jury selection and trial be continued. On April 10, 2018, the trial court issued a new case management order for jury selection to begin September 24, 2018 and trial to begin October 29, 2018. On June 4, 2019, [Appellant] filed an omnibus pre-trial motion challenging his arrest as well as a Rule 600 motion. On July 26, 2018, the trial court denied [Appellant]'s Rule 600 motion and scheduled a hearing on his omnibus pre-trial motion. On August 2, 2018, despite having been appointed on September 18, 2017, Attorney Farrell first entered his appearance. The court conducted a hearing on [Appellant]'s

omnibus pretrial motion on August 2, 2018, which continued over into August 6, 2018. On September 7, 2018, a revised omnibus pre-trial motion and brief in support of that motion was filed by the defense. After consideration of the testimony and the briefs of the defense and the Commonwealth, on September 14, 2018, the trial court issued its opinion and order denying said motion.

On September 24, 2018, jury selection commenced. Jury selection was scheduled to take place through the end of September leading up to the trial date at the end of October. Although selection of the jury panel had nearly been completed and the trial date was nearing, due to the pendency of [Appellant]'s petition for review to the Supreme Court regarding recusal, [Appellant] and the Commonwealth jointly requested the court postpone the trial, which the court granted.

Thereafter, on October 25, 2018, the Commonwealth filed a motion *in limine* to preclude expert testimony from Dr. Michael Crabtree for the defense. … On October 30, 2018, the defense filed a brief in opposition to the Commonwealth's motion *in limine* to preclude testimony from Dr. Crabtree. On October 30, 2018, following a hearing on the record, the trial court granted the Commonwealth's motion to preclude Dr. Crabtree's testimony regarding the voluntariness of [Appellant]'s confession. …

On February 19, 2019, jury selection began again with selection scheduled to take place through February and trial scheduled to begin on March 11, 2019. On March 8, 2019, the Commonwealth presented a motion *in limine* to preclude the testimony of an expert witness for the defense, Dr. [Robert] Levine. On March 11, 2019, the trial court issued its opinion and order addressing the expert testimony of Dr. Levine as well as re-visiting Dr. Crabtree's testimony. The trial court again ruled that Dr. Crabtree could not testify as to the voluntariness of [Appellant]'s confession during the guilt phase. The court further precluded the testimony of Dr. Levine, finding that his report was not admissible under Rule 702.

On March 11, 2019, [Appellant]'s multi-day trial began. At

the conclusion of the testimony, after deliberating on the guilt phase, on March 14, 2019, the jury found [Appellant] guilty of 1st Degree Murder, Attempted Homicide, Aggravated Assault, and two counts of Robbery. The jury then reconvened for the penalty phase. The Commonwealth presented the victim impact evidence. The Commonwealth offered the trial evidence in support of the aggravating factors, homicide committed in the course of a felony—Robbery, and placing another person in jeopardy—Michelle Powell. The Defense presented evidence of mitigating factors including Dr. Crabtree who offered expert testimony of [Appellant]'s mental health history, and his fetal alcohol syndrome. Dr. Crabtree opined that [Appellant] had an IQ of 93 indicating that [Appellant] was of average intelligence. [Appellant] also presented the testimony of his sister, who related [Appellant]'s family history, his multiple placement[s] during his involvement with CYS and his involvement in the juvenile justice system. After deliberation on the penalty phase, the jury found the existence of both aggravating factors, but found that the mitigating evidence outweighed the aggravating factors. Accordingly, the jury returned a unanimous decision for a life sentence.

On May 23, 2019, the trial court [sentenced Appellant to an aggregate term of life imprisonment, plus an additional twenty-two to forty-four years' imprisonment.]

… On June 21, 2019, [Appellant timely] filed his notice of appeal to the Superior Court from the judgment of sentence entered May 23, 2019. On July 3, 2019, the trial court ordered [Appellant] to file his concise statement of matters complained of on appeal. On July 24, 2019, the trial court granted Attorney Geary's request for an extension to file the concise statement…. [Appellant filed his concise statement on August 9, 2019.]

(Trial Court Opinion, filed June 12, 2020, at 1-13) (internal footnotes omitted).

Appellant raises ten issues on appeal:

1. Did the [trial] [c]ourt abuse its discretion in denying the admission of a Present Sense Impression and Excited Utterance which proved that Appellant did not shoot

- 8 -

victim Powell?

2. Did the [trial] [c]ourt abuse its discretion in refusing to permit Appellant to impeach victim Powell during cross-examination with a prior inconsistent statement proving that her boyfriend, and not Appellant, shot her?

3. Did the [trial] [c]ourt abuse its discretion in refusing to permit Appellant to impeach the Lead Investigator's testimony that Appellant was the sole suspect in the shooting with the 911 recording which proved that victim Powell's boyfriend shot her, not Appellant?

4. Did the [trial] [c]ourt abuse its discretion in denying the admission of the observations by a witness of suspicious conduct of victim Powell's son immediately after the murder?

5. Did the [trial] [c]ourt commit reversible error by failing to permit Appellant to challenge the voluntariness of his confession to offer evidence of Appellant's fetal alcohol syndrome, and intellectual disabilities at trial?

6. Did Appellant produce evidence of the substantial appearance of personal animus of the trial judge against defense counsel to justify of his Recusal Petition?

7. In conjunction with the above, did the [trial] [c]ourt prevent Appellant from producing evidence by refusing to permit a record to be made of the presentation of the Recusal Petition proceedings?

8. In conjunction with the above, did the [trial] [c]ourt abuse its discretion in denying to recuse itself from this case?

9. Did the [trial] [c]ourt abuse its discretion in ruling that Appellant's arrest was supported by probable cause?

10. Did the cumulative effect of all of the errors on evidentiary rulings deprive Appellant of a fair trial?

(Appellant's Brief at 7-9).

As a preliminary matter, issues not raised in a Pa.R.A.P. 1925(b)

- 9 -

statement will be deemed waived for appellate review. ***Commonwealth v. Castillo***, 585 Pa. 395, 888 A.2d 775 (2005). A Rule 1925(b) statement that is not specific enough for the trial court to identify and address the issues the defendant wishes to raise on appeal may also result in waiver. ***Commonwealth v. Reeves***, 907 A.2d 1 (Pa.Super. 2006), *appeal denied*, 591 Pa. 712, 919 A.2d 956 (2007). Significantly:

> When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review. When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues. In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.

***Id.*** at 2.

Instantly, in his brief on appeal, Appellant phrases his first issue as: "Did the [trial] [c]ourt abuse its discretion in denying the admission of a Present Sense Impression and Excited Utterance which proved that Appellant did not shoot victim Powell?" (Appellant's Brief at 7). Appellant, however, failed to include this specific claim in his Rule 1925(b) statement. Rather, the seventh issue in Appellant's concise statement reads as follows: "The trial [c]ourt erred by not admitting into evidence the 911 recording and the corresponding notes/transcript of the 911 Operator." (Appellant's Rule 1925(b) Statement, filed 8/9/19, at 2). While Appellant might have intended for the seventh issue in his concise statement to address the first issue presented in his brief, this

- 10 -

was not clear to the trial court. Instead, the trial court addressed the seventh issue presented in Appellant's concise statement in terms of Appellant's failure to authenticate the 911 phone call. The trial court did not discuss any exceptions to the rule against hearsay in its analysis. As Appellant's issue was not made clear to the trial court in a manner which allowed for the court to properly address it in its opinion, Appellant's first issue on appeal is waived for purposes of our review. ***See Reeves, supra***.

Similarly, Appellant failed to specify issues nine and ten in his Rule 1925(b) statement. Thus, Appellant has also waived these issues for appellate review.[3] ***See Castillo, supra***.

_____

[3] Appellant did not raise issue ten at all in his concise statement. Appellant did not specify in his concise statement his ninth issue on appeal which states: "Did the [trial] [c]ourt abuse its discretion in ruling that Appellant's arrest was supported by probable cause?" (Appellant's Brief at 9). Nevertheless, we note that the trial court seemingly discussed and disposed of this issue while addressing the fifth issue raised in Appellant's 1925(b) statement, which stated more generically that "[t]he trial [c]ourt erred in denying [Appellant]'s Second Pre-Trial Motion, in its entirety." (Appellant's Rule 1925(b) Statement at 1). In its analysis, the trial court explained that Appellant's second pre-trial motion challenged, *inter alia*, the legality of his arrest, claiming it lacked sufficient probable cause. The trial court initially found that the motion was filed "five years too late," per Pa.R.Crim.P. 579(A). (Trial Court Opinion at 27). The court, however, looked beyond this procedural deficiency to determine that the issue lacked merit where the following evidence from the suppression hearings in August 2018 proved there was sufficient probable cause to arrest Appellant: (1) Sergeant Martin and Lieutenant Bradley's testimony that Ms. Powell told them that the name of the man who shot her was Brandon; (2) Sergeant Martin's testimony that Ms. Powell described the shooter as a white male with dark hair and explained that the shooter lived in the 800 block of Addison Street; (3) Sergeant Martin's testimony that he was informed that Appellant was located at 808 Addison Street and, upon arriving

Appellant's second through fifth issues concern the admission of evidence. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Ballard*, 622 Pa. 177, 197-98, 80 A.3d 380, 392 (2013), *cert. denied*, 573 U.S. 940, 134 S.Ct. 2842, 189 L.Ed.2d 824 (2014).

> The term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Goldman*, 70 A.3d 874, 878-79 (Pa.Super. 2013), *appeal denied*, 624 Pa. 672, 85 A.3d 482 (2014). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81

---

at that location and being greeted by Appellant at the door, Sergeant Martin noticed Appellant matched Ms. Powell's description; (4) Sergeant Manfredi's testimony that one of his confidential informants ("CI") told him that Appellant was in the apartment next to the CI's on Addison Street and had admitted to shooting and/or killing somebody; and (5) Sergeant Manfredi's testimony that he learned that the shooter's name was Brandon and he was a white male. (***Id.*** at 26-29). While Appellant has waived this issue on appeal for vagueness in his Rule 1925(b) statement, we agree with the trial court's analysis and disposal of this issue as meritless.

(Pa.Super. 2012), *appeal denied*, 619 Pa. 678, 62 A.3d 379 (2013).

In his second and third issues combined, Appellant argues the trial court abused its discretion in refusing to permit Appellant to utilize the 911 phone call from Ms. Powell's neighbor, Mr. Lytle,[4] to impeach Ms. Powell and Lieutenant Stanek at trial. Regarding Ms. Powell, Appellant contends that, even if the 911 call did not qualify as substantive evidence, the call still should have been admitted as a prior inconsistent statement regarding who shot Ms. Powell. Appellant asserts the following exchange would prove that "someone other than [Appellant]" shot Ms. Powell:

> 911 Operator: …[A]ny idea who did this?
>
> [Mr. Lytle]: I—her—she said her—her boyfriend.
>
> 911 Operator: What's his name?
>
> [Mr. Lytle]: What's your boyfriend's name? (Inaudible response).
>
> [Mr. Lytle]: Matthew.
>
> 911 Operator: Where's he at?
>
> [Mr. Lytle]: Matthew Mathias.
>
> 911 Operator: Matthew Mathias?
>
> [Mr. Lytle]: Yes.

(Appellant's Brief at 21) (citing the Transcription of the 911 Call, dated 1/8/13).

---

[4] Mr. Lytle identified himself on the 911 call as his son-in-law, Bo Fleming.

- 13 -

Regarding Lieutenant Stanek, Appellant maintains he should have been permitted to utilize the 911 call to impeach Lieutenant Stanek where Appellant asserts Lieutenant Stanek's testimony "clearly leads the jury to believe that Appellant was the only suspect." (Appellant's Brief at 35). Specifically, Appellant takes issue with the following testimony from Lieutenant Stanek on direct examination:

> The common theme throughout this was that the shooter had been identified by first name, and that first name was Brandon, and that had come from the officers who were arriving on scene who had talked with the surviving victim, Michelle Powell. They were telling me this—that, you know, it was Brandon.

(***Id.*** at 34) (citing N.T. Trial, 3/13/19, at 438). Appellant avers that, in contrast to Lieutenant Stanek's testimony, Appellant was not the only possible suspect where the 911 call "evidenced that [Mr. Mathias] shot [Ms.] Powell. Not…Appellant." (Appellant's Brief at 35). Appellant concludes this Court should overturn his convictions, vacate his judgment of sentence, and remand for a new trial. We disagree.

The Pennsylvania Rules of Evidence provide:

> **Rule 613. Witness's Prior Inconsistent Statement to Impeach; Witness's Prior Consistent Statement to Rehabilitate**
>
> **(a) Witness's Prior Inconsistent Statement to Impeach.** A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility. The statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents must be shown or disclosed to an adverse party's attorney.

**(b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement.** Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,

> (1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;

> (2) the witness is given an opportunity to explain or deny the making of the statement; and

> (3) an adverse party is given an opportunity to question the witness.

> This paragraph does not apply to an opposing party's statement as defined in Rule 803(25).

Pa.R.E. 613(a)-(b). "Our courts long have permitted non-party witnesses to be cross-examined on prior statements they have made when those statements contradict their in-court testimony." *Commonwealth v. Carmody*, 799 A.2d 143, 148 (Pa.Super. 2002). "Such statements [are] known as prior inconsistent statements…." *Id.* "A party may impeach the credibility of an adverse witness by introducing evidence that the witness has made one or more statements inconsistent with his [or her] trial testimony." *Commonwealth v. Bailey*, 469 A.2d 604, 611 (Pa.Super. 1983). Nevertheless, "[m]ere dissimilarities or omissions in prior statements…do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." *Id.* Additionally, "it must be established that the witness, in fact, made the allegedly inconsistent statement."

- 15 -

*Commonwealth v. Woods*, 710 A.2d 626, 630 (Pa.Super. 1998), *appeal denied,* 556 Pa. 709, 729 A.2d 1129 (1998).

Instantly, regarding Appellant's claims concerning Ms. Powell, the 911 recording was comprised of communications between Mr. Lytle and the 911 operator. Ms. Powell did not participate in the call. The following discussion occurred at sidebar concerning this issue:

> [Defense Counsel]: It's a gentleman named John Lytle. He calls 911. This was provided to me by the Government in discovery. And he is with the witness and she's bleeding. They are in his home. He is on the 911 call. The 911 operator says, do we know who shot her. He says, who shot you. And you can hear her groaning in the background. And John Lytle says, her boyfriend. The 911 operator said, what is his name. John Lytle says what is your name. Matthew, Matthew. What's his last name. Mathias.
>
> The Court: Can you hear her on the tape?
>
> [Defense Counsel]: You can hear her groaning.
>
> [The Commonwealth]: Moaning.
>
> [Defense Counsel]: You can hear her moaning.
>
> [The Commonwealth]: So the nature of the 911 call, Your Honor, is that it's her groaning in the background. There is a man speaking and that man is speaking to the caller on the 911 call. Both of those people are available and could be called as witnesses to testify.
>
> [The Commonwealth]: We are objecting because she is not the one that is on the 911 call. He is a third party in this.
>
> [The Commonwealth]: Relaying it.
>
> [The Commonwealth]: Relaying it. So if he wants to play that after he calls these people, maybe that's how you

> lay the foundation for it. I don't think you can play the 911 tape from a third party relaying information from her because you can't determine the accuracy of it.
>
> The Court:    Can you hear her saying my boyfriend or do you just hear her groaning?
>
> [Defense Counsel]:  You just hear groaning.
>
> [The Commonwealth]:    And so that's one person's interpretation to another person on 911.

(N.T. Trial, 3/11/19, at 127-28).

This sidebar discussion makes clear that it was Mr. Lytle's statement on the 911 call concerning who the shooter was, not Ms. Powell's. As the trial court explained: "By defense counsel's admission, Ms. Powell can only be heard groaning on the recording. There is nothing within the 911 recording to indicate the victim's statement of who shot her. Furthermore, it is not appropriate to attempt to impeach Ms. Powell with the caller's, Mr. Lytle's, interpretation of what she may or may not have said immediately after being shot…" (Trial Court Opinion at 35-36). We agree with the trial court's explanation.

Similarly, regarding Lieutenant Stanek, the 911 call does not include any statements which could be used as impeachment evidence against him. As previously stated, the call occurred between Mr. Lytle and a 911 operator. Lieutenant Stanek was not involved. Thus, we conclude the court properly precluded the 911 call as impeachment evidence against Ms. Powell and Lieutenant Stanek. **See Ballard, supra**; **Woods, supra**.

- 17 -

In his fourth issue, Appellant argues the trial court abused its discretion in denying the admission of DeChaunte Adams' testimony regarding her observations of "suspicious conduct" on the part of her paramour Mike Breese, Ms. Powell's son. Specifically, Appellant contends the trial court erred in omitting Ms. Adams' testimony that, on the night of the shooting, Mr. Breese (1) sat in a dark room downstairs; (2) made no effort to go to the hospital to check on his mother after learning of the shooting; and (3) ran up to the bedroom and "put a gun in a drawer or took a gun from a drawer" and ran out of the house. (Appellant's Brief at 36-37). Appellant alleges this testimony would have been relevant to support his theory that Mr. Breese, not Appellant, shot and killed Mr. Mathias after growing tired of "the abuse [Mr.] Mathias perpetrated against [Ms.] Powell, [Mr.] Breese's Mother." (*Id.* at 38). Appellant concludes this Court should overturn his convictions, vacate his judgment of sentence, and remand for a new trial. We disagree.

Pennsylvania Rule of Evidence 401 defines relevant evidence as follows:

**Rule 401. Test for Relevant Evidence**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."

*Commonwealth v. Drumheller*, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003). "Once evidence is found to be relevant, it will be inadmissible only if its probative value is substantially outweighed by the danger of unfair prejudice or confusion." *Commonwealth v. Lilliock*, 740 A.2d 237, 244 (Pa.Super. 1999), *appeal denied*, 568 Pa. 657, 795 A.2d 972 (2000).

Pennsylvania Rule of Evidence 403 provides:

> **Rule 403.    Excluding    Relevant    Evidence    for Prejudice, Confusion, Waste of Time, or Other Reasons**
>
> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

Instantly, the trial court addressed this issue as follows:

> The trial court submits that Ms. Adams' testimony in this regard was entirely irrelevant.  Ms. Adams was going to testify to her observations of Mr. Breese on the night of the murder, even though there was no evidence that Mr. Breese was involved in the killing of Mr. Mathias and shooting of Ms. Powell.  The evidence presented was overwhelming that [Appellant] is the one who committed the shooting.  The testimony offered, that [Ms. Powell]'s son was upset and looking for a gun after finding out that his mother had been shot, was not probative to the issue.  Furthermore, any potential probative value of the evidence was outweighed by the danger of misleading the jury.  Allowing this evidence to come in would only serve to confuse and mislead the jury. Thus, it was proper to exclude Ms. Adams' testimony regarding her observations of Mr. Breese on the night in question.

(Trial Court Opinion at 41). We agree with the trial court's analysis. Ms. Adams' testimony concerning her observations of Mr. Breese on the night in question was completely irrelevant to establish who killed Mr. Mathias and shot Ms. Powell, where there was no evidence that Mr. Breese was involved. That Mr. Breese sat in a dark room, did not go to the hospital to see his mother, and possibly "put a gun in a drawer or took a gun from a drawer" do nothing to prove that he was involved in the shootings or that Appellant was not. *See* Pa.R.E. 401; ***Drumheller, supra***. Thus, Appellant is not entitled to relief on this claim.

In his fifth issue, Appellant argues the trial court erred in granting the Commonwealth's motion *in limine* seeking to prohibit licensed psychologist and expert witness, Dr. Michael Crabtree, from testifying as to the voluntariness of Appellant's confession. Appellant avers Dr. Crabtree would have testified to Appellant's brain damage, learning disability, and cognitive impairments. Despite the trial court's refusal to admit Dr. Crabtree's testimony on these topics, Appellant asserts the court seemingly reversed its position on this issue in its September 14, 2018 order and opinion denying Appellant's suppression motion, acknowledging that testimony on such topics was admissible, stating:

> This jury instruction merely reiterates the proposition that there are a variety of factors that must be considered when determining whether a defendant has voluntarily waived his ***Miranda*** rights before giving a confession. Any cognitive disabilities of [Appellant] would be only one of multiple

- 20 -

> factors to determine the voluntariness of his confession, but do not warrant that he should be treated as a juvenile.

(Appellant's Brief at 44) (citing Trial Court's Order and Opinion, filed 9/14/18, at 17). Additionally, Appellant avers the court erred in relying on cases involving false confession experts to reject Dr. Crabtree's testimony where Dr. Crabtree (1) was not a false confession expert, and (2) was offered to testify to the very factors the jury must consider and weigh during deliberations (*e.g.*, Appellant's intelligence, education, mental state, etc.). Appellant maintains Dr. Crabtree's testimony concerned the voluntariness of Appellant's confession, which is "separate and distinct" from false confession testimony. (Appellant's Brief at 47).

Appellant further attacks the court's decision to exclude Dr. Crabtree's testimony based upon the court's observations of Appellant in the courtroom. Appellant contends the court cannot make such a decision where the judge was not an expert on neurological deficits, and the court's opinion was "based upon limited observations of Appellant 6 years after the night in question." (*Id.* at 49). Appellant concludes the omission of Dr. Crabtree's testimony denied him a fair trial and the court's decision constitutes reversible error. We disagree.

"[A] court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review." ***Commonwealth v. Reese***, 31 A.3d 708, 715 (Pa.Super. 2011) (*en banc*). Likewise, "[o]ur standard of review in cases involving the admission of expert testimony is

broad: Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion." *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa.Super. 2008) (internal citation and quotation marks omitted). "An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." *Id.*

Pennsylvania Rule of Evidence 702 governs the admission of expert testimony and provides:

> **Rule 702.  Testimony by Expert Witnesses**
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c)  the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.  Furthermore, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Pa.R.E. 703.

Additionally, "[t]here has been a long-standing policy in this Commonwealth of protecting the jury's prerogative to determine credibility from the undue influence that accompanies expert testimony on the subject

of credibility of witnesses." ***Commonwealth v. Pugh***, 101 A.3d 820, 822 (Pa.Super. 2014) (*en banc*), *appeal denied*, 632 Pa. 670, 117 A.3d 296 (2015) (*en banc*). Significantly, our Supreme Court has held that "[e]xpert testimony on the phenomenon of false confessions…invade[s] the jury's exclusive role as the sole arbiter of credibility." ***Id.*** at 823 (relying on ***Commonwealth v. Alicia***, 625 Pa. 429, 92 A.3d 753 (2014)).

In ***Alicia***, the defendant was charged with murder and related offenses. During police questioning, the defendant ultimately confessed to shooting the victim. The defendant later filed a motion for use of a false confessions expert, claiming that defendant is of low intelligence and had been a SSI disability beneficiary for most of his life due to mental health issues, and was susceptible to making a false confession. The Commonwealth filed a motion to exclude any such defense expert. The court permitted the expert's proffered testimony, in part, and the Commonwealth filed an interlocutory appeal. A divided panel of this Court affirmed.

Nevertheless, our Supreme Court reversed, holding that "expert testimony [regarding false confessions] constitutes an impermissible invasion of the jury's role as the exclusive arbiter of credibility." ***Id.*** at 446, 92 A.3d at 764. The Court further stated: "[T]he matter of whether [the defendant's] confession is false is best left to the jury's common sense and life experience, after proper development of relevant issues related to, *inter alia*, the particular circumstances surrounding the elicitation of his confession, using the

traditional and time-honored techniques of cross-examination and argument."

***Id.*** at 447, 92 A.3d 764.

Instantly, after taking into consideration Dr. Crabtree's original and amended reports, as well as the Commonwealth's and defense counsel's arguments, the court granted the Commonwealth's motion *in limine* and excluded Dr. Crabtree's testimony. The court reasoned:

> Review of the amended expert report of the proposed defense expert, Dr. Crabtree, dated March 4, 2019, reveals that the amended report is not significantly different from his original expert report dated October 16, 2018, which the court excluded following argument on the Commonwealth's previous motion *in limine*, by order dated October 30, 2018. Both the original report and amended report of Dr. Crabtree opine as to [Appellant]'s ability to understand the waiver of his constitutional rights and to understand the questions that were asked of him by police. As such, Dr. Crabtree's opinions go directly to the voluntariness of his confession and invade the province of the jury, in contravention to the case law set forth in [***Alicia, supra***] and [***Pugh, supra***]. Unlike the defendant in ***Pugh***, [Appellant] has never recanted his confession or claimed that he did not understand the nature of the ***Miranda*** warnings given to him prior to the confession. Unlike the defendant in ***Alicia***, whose "IQ was 64, placing him in the range considered mentally retarded," [Appellant]'s IQ is 84, according to Dr. Crabtree's report, and according to the Torrance [State Hospital] report dated September 23, 2015, his IQ is 93, within the average range of intellectual ability. While Dr. Crabtree's expert report regarding [Appellant]'s learning disabilities and fetal alcohol syndrome would be appropriate for the penalty phase of the trial, should that occur, such expert report is not admissible for the guilty phase of the trial.
>
> Following the hearings on [Appellant]'s Revised Omnibus Pretrial Motion, the trial court entered an order denying the motion to suppress the confession, finding that [Appellant] knowingly and intelligently waived his ***Miranda*** rights. The

court found that [Appellant] did not demonstrate any cognitive impairment to police, or lack of understanding of the waiver, or of the questions asked, or the charges. The trial court further found no evidence that [Appellant] was subjected to coercive tactics or unduly harsh conditions during his questioning or that he lacked sufficient intelligence to understand the waiver of his rights. The court further noted that, based on the representations of counsel regarding [Appellant]'s enhanced level of participation in his defense (which [Appellant] continued to demonstrate during jury selection), [Appellant] does not exhibit signs of cognitive impairment which would have interfered with his knowing, intelligent, and voluntary waiver of his *Miranda* rights on the night the crimes were committed.

(Trial Court Opinion and Order, filed March 11, 2019, at 1-2). We agree with the trial court's analysis of this issue. Here, Dr. Crabtree's expert report and proposed testimony concerned Appellant's inability to voluntarily confess to the crimes at issue due to his cognitive impairments. Although Appellant attempts to differentiate this case from that involving a "false confession expert," Dr. Crabtree's proffered testimony would similarly conflict with the jury's responsibility to assess the credibility of Appellant's confession. *See Alicia, supra*; *Pugh, supra*. Thus, the trial court properly granted the Commonwealth's motion *in limine* to exclude Dr. Crabtree's testimony, and Appellant's claim merits no relief. *See Reese, supra*; *Watson, supra*.

For purposes of disposition, we combine Appellant's sixth, seventh, and eighth issues.[5] In these issues, Appellant argues that the trial court erred in

_____

[5] Appellant failed to present separate argument sections in his brief regarding issues seven and eight, which could warrant waiver. *See Commonwealth*

denying his recusal motion where Appellant's counsel produced sufficient evidence of the trial court's "personal animus" toward counsel. Appellant avers the trial court exhibited personal animus toward counsel after counsel requested the trial court remove Attorney Davis as co-counsel due to counsel's pending lawsuit against Attorney Davis' cousin. Appellant contends counsel explained to the court that Attorney Davis' cousin hated counsel due to the lawsuit, to which the trial court replied: "There are a lot of people who hate you." (Appellant's Brief at 53). Appellant maintains counsel interpreted the court's comment to mean that the trial judge included himself in the group of people who hated counsel. Additionally, Appellant asserts the trial court refused to allow counsel to find alternative death penalty-certified co-counsel and forced counsel to "draft, file, and present a Motion for Reconsideration" before the court replaced Attorney Davis with Attorney Farrell. (*Id.* at 55). Appellant additionally claims the court belittled the existence of the apparent conflict with Attorney Davis, and stated the conflict existed only "in the mind" of counsel. (*Id.*) As further evidence of the court's "personal animus" toward

---

*v. Buterbaugh*, 91 A.3d 1247, 1262 (Pa.Super. 2014) (stating: "The Pennsylvania Rules of Appellate Procedure require that each question an appellant raises be supported by discussion and analysis of pertinent authority, and failure to do so constitutes waiver of the claim"). *See also* Pa.R.A.P. 2119(a) (stating argument section shall be divided into as many sections as there are questions presented, followed by discussion and citations to pertinent legal authorities). Nevertheless, Appellant has apparently combined all these arguments together as the sixth issue in his brief. Thus, we choose to address them here.

counsel, Appellant also alleges the court failed to pay a $5,000.00 bill that counsel submitted, but the court managed to pay a $27,000.00 bill for Attorney Farrell. Appellant emphasizes that in order to be paid, counsel had to sue the trial judge.

Appellant further asserts that he presented his recusal petition in a timely manner and, at the presentation of the recusal motion, the trial judge "became so enraged that he prevented a record of the presentation proceedings from being made by the Court Stenographer," and prevented the proceedings from being audio recorded as well. (*Id.* at 56). Based upon these actions by the trial judge, Appellant alleges the court's statement in its opinion that Appellant "has failed to offer any evidence" is disingenuous where the trial court prevented any record from being created for this issue. (*Id.* at 56) (citing Trial Court Opinion, filed June 12, 2020, at 17-18). Appellant concludes the trial court erred in denying the recusal motion and, if this Court should grant a new trial, it should ensure that a different judge preside over the proceedings. We disagree.

"[A] party seeking recusal or disqualification must raise the objection at the earliest possible moment or that party will suffer the consequence of being time barred." *Commonwealth v. Pappas*, 845 A.2d 829, 846 (Pa.Super. 2004), *appeal denied*, 580 Pa. 712, 862 A.2d 1254 (2004). Furthermore, "[i]t is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's

ability to preside impartially." ***Commonwealth v. Birdsong***, 611 Pa. 203, 222, 24 A.3d 319, 330 (2011). "In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome." ***Commonwealth v. Flor***, 606 Pa. 384, 443, 998 A.2d 606, 641-42 (2010), *cert. denied*, 563 U.S. 941, 131 S.Ct. 2102, 179 L.Ed.2d 900 (2011). "The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary." ***Id.*** at 443, 998 A.2d at 642.

Instantly, the court appointed Attorney Davis as co-counsel on August 22, 2017, and Appellant filed a motion for reconsideration of the appointment on September 12, 2017. The court granted counsel's request on September 18, 2017, appointed Attorney Farrell as co-counsel, and rescinded the order appointing Attorney Davis. Appellant, however, waited to file his recusal motion until December 4, 2017. Thus, Appellant's motion is arguably untimely. ***See Pappas, supra***. ***See e.g., Lomas v. Kravitz***, 642 Pa. 181, 170 A.3d 380 (2017) (determining recusal issue was waived where appellant filed motion more than one month after all facts supporting motion had been disclosed).

Moreover, even if Appellant's motion was timely filed, it would merit no relief. Appellant's arguments concerning recusal focus on counsel's and the

court's interactions, and apparent disagreements, over replacing Attorney Davis with Attorney Farrell as co-counsel. Appellant contends the court made disparaging remarks toward counsel, repeatedly refused counsel's request to appoint Attorney Farrell, and caused counsel to spend time "draft[ing], fil[ing], and present[ing] a Motion for Reconsideration." Ultimately, however, Appellant and counsel got their way, and the court agreed to appoint Attorney Farrell as co-counsel and remove Attorney Davis as co-counsel. Furthermore, Appellant's remaining complaints concern issues that occurred after the filing of the recusal motion. Appellant has therefore failed to present sufficient evidence of any bias, prejudice, or unfairness, and the trial court properly denied Appellant's recusal motion. *See Birdsong, supra*; *Flor, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/27/2021